# McCULLOCH, CHAIRMAN, NATIONAL LABOR RELATIONS BOARD, et al. v. SOCIEDAD NACIONAL de MARINEROS de HONDURAS.

No. 107.  Argued December 11–12, 1962.—
Decided February 18, 1963.*

---

*Together with No. 91, *McLeod, Regional Director, National Labor Relations Board,* v. *Empresa Hondurena de Vapores, S. A.,* and No. 93, *National Maritime Union of America, AFL–CIO,* v. *Empresa Hondurena de Vapores, S. A.,* both on certiorari to the United States Court of Appeals for the Second Circuit, argued and decided on the same dates.

*Dominick L. Manoli* argued the cause for petitioners in Nos. 91 and 107. With him on briefs for the Regional Director and members of the National Labor Relations Board in all three cases were *Stuart Rothman* and *Norton J. Come.*

*Herman E. Cooper* argued the cause for petitioner in No. 93. With him on the brief was *H. Howard Ostrin.*

*Charles S. Rhyne* argued the cause for respondent in No. 107. With him on the brief was *Brice W. Rhyne.*

*Orison S. Marden* argued the cause for respondent in Nos. 91 and 93. With him on the brief was *Chester Bordeau.*

*Solicitor General Cox,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging affirmance. With him on the brief were *Acting Assistant Attorney General Guilfoyle, Daniel M. Friedman* and *Morton Hollander.*

Briefs of *amici curiae,* urging affirmance, were filed by *Lawrence Hunt* for the Government of the United Kingdom of Great Britain and Northern Ireland, by *Robert MacCrate* for Canada, by *James F. Sams* for the Government of the Republic of Honduras, and by *Alfred Giardino* for the United Fruit Company.

A brief urging reversal was filed by *J. Albert Woll, Robert C. Mayer, Theodore J. St. Antoine* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae.*

MR. JUSTICE CLARK delivered the opinion of the Court.

These companion cases, involving the same facts, question the coverage of the National Labor Relations Act, as amended, 61 Stat. 136, 73 Stat. 541, 29 U. S. C. §§ 151 *et seq.* A corporation organized and doing business in the United States beneficially owns seagoing vessels which make regular sailings between United States, Latin American and other ports transporting the corporation's products and other supplies; each of the vessels is legally owned by a foreign subsidiary of the American corporation, flies the flag of a foreign nation, carries a foreign crew and has other contacts with the nation of its flag. The question arising is whether the Act extends to the crews engaged in such a maritime operation. The National Labor Relations Board in a representation proceeding on the application of the National Maritime Union held that it does and ordered an election. 134 N. L. R. B. 287. The vessels' foreign owner sought to enjoin the Board's Regional Director from holding the election, but the District Court for the Southern District of New York denied the requested relief. 200 F. Supp. 484. The Court of Appeals for the Second Circuit reversed, holding that the Act did not apply to the maritime operations here and thus the Board had no power to direct the election. 300 F. 2d 222. The N. M. U. had intervened in the proceeding, and it petitioned for a writ of certiorari (No. 93), as did the Regional Director (No. 91). Meanwhile, the United States District Court for the District of Columbia, on application of the foreign bargaining agent of the vessels' crewmen, enjoined the Board members in No. 107. 201 F. Supp. 82. We granted each of the three petitions for certiorari, 370 U. S. 915, and consolidated the cases for argument.[1]

---

[1] In No. 107, appeal was perfected to the Court of Appeals for the District of Columbia Circuit, to which court we granted a writ of certiorari before judgment.

We have concluded that the jurisdictional provisions of the Act do not extend to maritime operations of foreign-flag ships employing alien seamen.

## I.

The National Maritime Union of America, AFL–CIO, filed a petition in 1959 with the National Labor Relations Board seeking certification under § 9 (c) of the Act, 29 U. S. C. § 159 (c), as the representative of the unlicensed seamen employed upon certain Honduran-flag vessels owned by Empresa Hondurena de Vapores, S. A., a Honduran corporation. The petition was filed against United Fruit Company, a New Jersey corporation which was alleged to be the owner of the majority of Empresa's stock. Empresa intervened and on hearing it was shown that United Fruit owns all of its stock and elects its directors, though no officer or director of Empresa is an officer or director of United Fruit and all are residents of Honduras. In turn the proof was that United Fruit is owned by citizens of the United States and maintains its principal office at Boston. Its business was shown to be the cultivation, gathering, transporting and sale of bananas, sugar, cacao and other tropical produce raised in Central and South American countries and sold in the United States.

United Fruit maintains a fleet of cargo vessels which it utilizes in this trade. A portion of the fleet consists of 13 Honduran-registered vessels operated [2] by Empresa and time chartered to United Fruit, which vessels were included in National Maritime Union's representation proceeding. The crews on these vessels are recruited by Empresa in Honduras. They are Honduran citizens (save one Jamaican) and claim that country as their

---

[2] Ten of the 13 vessels are owned and operated by Empresa. Three are owned by Balboa Shipping Co., Inc., a Panamanian subsidiary of United Fruit. Empresa acts as an agent for Balboa in the management of the latter vessels.

residence and home port. The crew are required to sign Honduran shipping articles, and their wages, terms and condition of employment, discipline, etc., are controlled by a bargaining agreement between Empresa and a Honduran union, Sociedad Nacional de Marineros de Honduras. Under the Honduran Labor Code only a union whose "juridic personality" is recognized by Honduras and which is composed of at least 90% of Honduran citizens can represent the seamen on Honduran-registered ships. The N. M. U. fulfils neither requirement. Further, under Honduran law recognition of Sociedad as the bargaining agent compels Empresa to deal exclusively with it on all matters covered by the contract. The current agreement in addition to recognition of Sociedad provides for a union shop, with a no-strike-or-lockout provision, and sets up wage scales, special allowances, maintenance and cure provisions, hours of work, vacation time, holidays, overtime, accident prevention, and other details of employment as well.

United Fruit, however, determines the ports of call of the vessels, their cargoes and sailings, integrating the same into its fleet organization. While the voyages are for the most part between Central and South American ports and those of the United States, the vessels each call at regular intervals at Honduran ports for the purpose of taking on and discharging cargo and, where necessary, renewing the ship's articles.

## II.

The Board concluded from these facts that United Fruit operated a single, integrated maritime operation within which were the Empresa vessels, reasoning that United Fruit was a joint employer with Empresa of the seamen covered by N. M. U.'s petition. Citing its own *West India Fruit & Steamship Co.* opinion, 130 N. L. R. B. 343 (1961), it concluded that the maritime

operations involved substantial United States contacts, outweighing the numerous foreign contacts present. The Board held that Empresa was engaged in "commerce" within the meaning of § 2 (6) of the Act [3] and that the maritime operations "affected commerce" within § 2 (7),[4] meeting the jurisdictional requirement of § 9 (c)(1).[5] It therefore ordered an election to be held among the seamen signed on Empresa's vessels to determine whether they wished N. M. U., Sindicato Maritimo Nacional de Honduras,[6] or no union to represent them.

As we have indicated, both Empresa and Sociedad brought suits in Federal District Courts to prevent the election, Empresa proceeding in New York against the Regional Director—Nos. 91 and 93—and Sociedad in the

---

[3] 29 U. S. C. § 152 (6):

"The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country."

[4] 29 U. S. C. § 152 (7):

"The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

[5] 29 U. S. C. § 159 (c)(1):

"Whenever a petition shall have been filed . . . the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing . . . ."

Section 10 (a) of the Act, 29 U. S. C. § 160 (a), imposes the same requirement, empowering the Board to "prevent any person from engaging in any unfair labor practice . . . affecting commerce."

[6] Sindicato, a Honduran union, had intervened in the proceeding. Sociedad was invited to intervene but declined to do so.

District of Columbia against the members of the Board—No. 107. In Nos. 91 and 93 the jurisdiction of the District Court was challenged on two grounds: first, that review of representation proceedings is limited by § 9 (d) of the Act, 29 U. S. C. § 159 (d), to indirect review as part of a petition for enforcement or review of an order entered under § 10 (c), 29 U. S. C. § 160 (c); and, second, that the Board members were indispensable parties to the action. The challenge based upon § 9 (d) was not raised or adjudicated in Sociedad's action against the Board members—No. 107—and the indispensable-parties challenge is of course not an issue. Sociedad is not a party in Nos. 91 and 93, although the impact of the Board order—the same order challenged in No. 107—is felt by it. That order has the effect of canceling Sociedad's bargaining agreement with Empresa's seamen, since Sociedad is not on the ballot called for by the Board. No. 107, therefore, presents the question in better perspective, and we have chosen it as the vehicle for our adjudication on the merits. This obviates our passing on the jurisdictional questions raised in Nos. 91 and 93, since the disposition of those cases is controlled by our decision in No. 107.

We are not of course precluded from reexamining the jurisdiction of the District Court in Sociedad's action, merely because no challenge was made by the parties. *Mitchell* v. *Maurer,* 293 U. S. 237, 244 (1934). Having examined the question whether the District Court had jurisdiction at the instance of Sociedad to enjoin the Board's order, we hold that the action falls within the limited exception fashioned in *Leedom* v. *Kyne,* 358 U. S. 184 (1958). In that case judicial intervention was permitted since the Board's order was "in excess of its delegated powers and contrary to a specific prohibition in the Act." *Id.,* at 188. While here the Board has violated no specific prohibition in the Act, the overriding consideration is that the Board's assertion of power to determine

the representation of foreign seamen aboard vessels under foreign flags has aroused vigorous protests from foreign governments and created international problems for our Government. Important interests of the immediate parties are of course at stake. But the presence of public questions particularly high in the scale of our national interest because of their international complexion is a uniquely compelling justification for prompt judicial resolution of the controversy over the Board's power. No question of remotely comparable urgency was involved in *Kyne*, which was a purely domestic adversary situation. The exception recognized today is therefore not to be taken as an enlargement of the exception in *Kyne*.

### III.

Since the parties all agree that the Congress has constitutional power to apply the National Labor Relations Act to the crews working foreign-flag ships, at least while they are in American waters, *The Exchange*, 7 Cranch 116, 143 (1812); *Wildenhus's Case*, 120 U. S. 1, 11 (1887); *Benz* v. *Compania Naviera Hidalgo*, 353 U. S. 138, 142 (1957), we go directly to the question whether Congress exercised that power. Our decision on this point being dispositive of the case, we do not reach the other questions raised by the parties and the *amici curiae*.

The question of application of the laws of the United States to foreign-flag ships and their crews has arisen often and in various contexts.[7] As to the application of the National Labor Relations Act and its amendments, the Board has evolved a test relying on the relative weight of a ship's foreign as compared with its American contacts. That test led the Board to conclude here, as in *West India Fruit & Steamship Co., supra,* that the foreign-flag ships' activities affected "commerce" and brought

---

[7] See generally Comment, 69 Yale L. J. 498, 506–511 (1960); Boczek, Flags of Convenience (1962).

them within the coverage of the Act. Where the balancing of the vessel's contacts has resulted in a contrary finding, the Board has concluded that the Act does not apply.[8]

Six years ago this Court considered the question of the application of the Taft-Hartley amendments to the Act in a suit for damages "resulting from the picketing of a foreign ship operated entirely by foreign seamen under foreign articles while the vessel [was] temporarily in an American port." *Benz* v. *Compania Naviera Hidalgo, supra,* at 139. We held that the Act did not apply, searching the language and the legislative history and concluding that the latter "inescapably describes the boundaries of the Act as including only the workingmen of our own country and its possessions." *Id.,* at 144. Subsequently, in *Marine Cooks & Stewards* v. *Panama S. S. Co.,* 362 U. S. 365 (1960), we held that the Norris-LaGuardia Act, 29 U. S. C. § 101, deprived a Federal District Court of jurisdiction to enjoin picketing of a foreign-flag ship, specifically limiting the holding to the jurisdiction of the court "to issue the injunction it did under the circumstances shown." *Id.,* at 372. That case cannot be regarded as limiting the earlier *Benz* holding, however, since no question as to "whether the picketing . . . was tortious under state or federal law" was either presented or decided. *Ibid.* Indeed, the Court specifically noted that the application of the Norris-LaGuardia Act "to curtail and regulate the jurisdiction of courts" differs from the application of the Taft-Hartley Act "to regulate the conduct of people engaged in labor disputes." *Ibid.;* see Comment, 69 Yale L. J. 498, 523–525 (1960).

It is contended that this case is nonetheless distinguishable from *Benz* in two respects. First, here there is a fleet of vessels not temporarily in United States waters but

[8] *E. g., Dalzell Towing Co.,* 137 N. L. R. B. No. 48, 50 L. R. R. M. 1164 (1962).

operating in a regular course of trade between foreign ports and those of the United States; and, second, the foreign owner of the ships is in turn owned by an American corporation. We note that both of these points rely on additional American contacts and therefore necessarily presume the validity of the "balancing of contacts" theory of the Board. But to follow such a suggested procedure to the ultimate might require that the Board inquire into the internal discipline and order of all foreign vessels calling at American ports. Such activity would raise considerable disturbance not only in the field of maritime law but in our international relations as well. In addition, enforcement of Board orders would project the courts into application of the sanctions of the Act to foreign-flag ships on a purely *ad hoc* weighing of contacts basis.[9] This would inevitably lead to embarrassment in foreign affairs and be entirely infeasible in actual practice. The question, therefore, appears to us more basic; namely, whether the Act as written was intended to have any application to foreign registered vessels employing alien seamen.

Petitioners say that the language of the Act may be read literally as including foreign-flag vessels within its coverage. But, as in *Benz,* they have been unable to point to any specific language in the Act itself or in its extensive legislative history that reflects such a congressional intent. Indeed, the opposite is true as we found in *Benz,* where

---

[9] Our conclusion does not foreclose such a procedure in different contexts, such as the Jones Act, 46 U. S. C. § 688, where the pervasive regulation of the internal order of a ship may not be present. As regards application of the Jones Act to maritime torts on foreign ships, however, the Court has stated that "[p]erhaps the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag." *Lauritzen* v. *Larsen,* 345 U. S. 571, 584 (1953); see *Romero* v. *International Terminal Operating Co.,* 358 U. S. 354, 381–384 (1959); Boczek, *op. cit., supra,* note 7, at 178–180.

20

we pointed to the language of Chairman Hartley characterizing the Act as "a bill of rights both for *American* workingmen and for their employers." 353 U. S., at 144. We continue to believe that if the sponsors of the original Act or of its amendments conceived of the application now sought by the Board they failed to translate such thoughts into describing the boundaries of the Act as including foreign-flag vessels manned by alien crews.[10]   Therefore, we find no basis for a construction which would exert United States jurisdiction over and apply its laws to the internal management and affairs of the vessels here flying the Honduran flag, contrary to the recognition long afforded them not only by our State Department[11]

---

[10] In 1959 Congress enacted § 14 (c) (1) of the Act, 29 U. S. C. (Supp. II) § 164 (c) (1), granting the Board discretionary power to decline jurisdiction over labor disputes with insubstantial effects, with a proviso that:

". . . the Board shall not decline to assert jurisdiction over any labor dispute over which it would assert jurisdiction under the standards prevailing upon August 1, 1959."

It is argued that the Board would have exerted jurisdiction over Empresa's vessels and crewmen under those "standards," as illustrated by its action in *Peninsular & Occidental Steamship Co.*, 120 N. L. R. B. 1097 (1958), about which case the Congress is presumed to have known.  Aside from the fact that Congress presumably was aware also of our decision in *Benz,* the argument is unconvincing. Nothing in the language or the legislative history of the 1959 amendments to the Act clearly indicates a congressional intent to apply the Act to foreign-flag ships and their crews.  The "standards" to which § 14 (c) (1) refers are the minimum dollar amounts established by the Board for jurisdictional purposes, and the problem to which § 14 (c) is addressed is the "no-man's land" created by *Guss* v. *Utah Labor Relations Board,* 353 U. S. 1 (1957).  See 25 N. L. R. B. Ann. Rep. 18–19 (1960); II Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (1959), 1153–1154, 1720; 105 Cong. Rec. 6548–6549, 18134.

[11] State Department regulations provide that a foreign vessel includes "any vessel regardless of ownership, which is documented under the laws of a foreign country."  22 CFR § 81.1 (f).

but also by the Congress.[12]  In addition, our attention is called to the well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship.  See *Wildenhus's Case, supra,* at 12; Colombos, The International Law of the Sea (3d rev. ed. 1954), 222–223.  The possibility of international discord cannot therefore be gainsaid.  Especially is this true on account of the concurrent application of the Act and the Honduran Labor Code that would result with our approval of jurisdiction.  Sociedad, currently the exclusive bargaining agent of Empresa under Honduran law, would have a head-on collision with N. M. U. should it become the exclusive bargaining agent under the Act.  This would be aggravated by the fact that under Honduran law N. M. U. is prohibited from representing the seamen on Honduran-flag ships even in the absence of a recognized bargaining agent.  Thus even though Sociedad withdrew from such an intramural labor fight—a highly unlikely circumstance—questions of such international import would remain as to invite retaliatory action from other nations as well as Honduras.

The presence of such highly charged international circumstances brings to mind the admonition of Mr. Chief Justice Marshall in *The Charming Betsy,* 2 Cranch 64, 118 (1804), that "an act of congress ought never to be construed to violate the law of nations if any other possible construction remains . . . ."  We therefore conclude, as we did in *Benz,* that for us to sanction the exercise of local sovereignty under such conditions in this "delicate field of international relations there must

---

[12] Article X of the Treaty of Friendship, Commerce and Consular Rights between Honduras and the United States, 45 Stat. 2618 (1927), provides that merchant vessels flying the flags and having the papers of either country "shall, both within the territorial waters of the other High Contracting Party and on the high seas, be deemed to be the vessels of the Party whose flag is flown."

be present the affirmative intention of the Congress clearly expressed." 353 U. S., at 147. Since neither we nor the parties are able to find any such clear expression, we hold that the Board was without jurisdiction to order the election. This is not to imply, however, "any impairment of our own sovereignty, or limitation of the power of Congress" in this field. *Lauritzen* v. *Larsen*, 345 U. S. 571, 578 (1953). In fact, just as we directed the parties in *Benz* to the Congress, which "alone has the facilities necessary to make fairly such an important policy decision," 353 U. S., at 147, we conclude here that the arguments should be directed to the Congress rather than to us. Cf. *Lauritzen* v. *Larsen, supra,* at 593.

The judgment of the District Court is therefore affirmed in No. 107. The judgment of the Court of Appeals in Nos. 91 and 93 is vacated and the cases are remanded to that court, with instructions that it remand to the District Court for dismissal of the complaint in light of our decision in No. 107.                     *It is so ordered.*

MR. JUSTICE GOLDBERG took no part in the consideration or decision of these cases.

MR. JUSTICE DOUGLAS, concurring.[1]

I had supposed that the activities of American labor organizations whether related to domestic vessels or to foreign ones were covered by the National Labor Relations Act, at least absent a treaty which evinces a different policy.[2]   Cf. *Cook* v. *United States*, 288 U. S. 102, 118–

---

[1] [This opinion applies also to No. 33, *Incres Steamship Co., Ltd.,* v. *International Maritime Workers, post,* p. 24.]

[2] It is agreed that Article XXII of the Treaty of Friendship, Commerce, and Consular Rights between the United States and Honduras, 45 Stat. 2618 (1927), and Article X of the Convention with Liberia of October 7, 1938, 54 Stat. 1751, 1756, grant those nations exclusive jurisdiction over the matters here involved.

120. But my views were rejected in *Benz* v. *Compania Naviera Hidalgo,* 353 U. S. 138; and, having lost that cause in *Benz,* I bow to its inexorable extension here. The practical effect of our decision is to shift from all the taxpayers to seamen alone the main burden of financing an executive policy of assuring the availability of an adequate American-owned merchant fleet for federal use during national emergencies. See Note, Panlibhon Registration of American-Owned Merchant Ships: Government Policy and the Problem of the Courts, 60 Col. L. Rev. 711.