**Ava McCLURE, Administratrix of the Estate of Eugene McClure, Deceased, Appellant,**

v.

**UNITED STATES LINES COMPANY, Appellee.**

**No. 10014.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 2, 1965.

Decided Oct. 24, 1966.

C. Arthur Rutter, Jr., Norfolk, Va. (Amato, Babalas, Breit, Cohen, Rutter & Friedman, and Gordon E. Campbell and Wayne Lustig, Norfolk, Va., on brief) for appellant.

Harry E. McCoy, Norfolk, Va. (Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief) for appellee.

Before HAYNSWORTH, Chief Judge, SOBELOFF, Circuit Judge, and MICHIE, District Judge.

HAYNSWORTH, Chief Judge.

The widow of an American seaman seeks damages because of the death of her husband following a fall into the waters of a French harbor. Her theory is that members of the crew of the American Angler were negligent in the performance of a duty of assistance, arising under French law, when her thoroughly drunken husband was attempting to find his own ship, the Keystone State.

At approximately 11:45 P.M. on March 31, 1961, McClure was attempting to return from authorized shore leave to the Keystone State, which was then moored at the outer mole at the port of La Pallice, France. He alighted from an automobile onto a dock in the inner harbor at La Pallice more than a mile from where the Keystone State was berthed, but at which the American Angler was moored. Although it was realized that McClure was not a member of the crew of the American Angler, several members of her crew undertook to assist him because of his extreme intoxication. The chief engineer brought a chair and seated McClure twenty to twenty-five feet from the edge of the dock. He was given coffee. Twice he was restrained from leaving the area because he was thought to be too intoxicated to travel alone along the waterfront. McClure could not answer questions, but, from his papers, they knew his name and that he was an American seaman.

The master, the chief engineer and the second engineer of the American Angler, with other members of her crew, were among those who observed McClure and provided assistance. Eventually, the master left McClure and returned to the ship. The chief engineer then offered to assist McClure in his effort to find his own ship. He told McClure to wait on the dock while he obtained a jacket from aboard ship. At that time, although McClure appeared less intoxicated and seemed to understand what was being said to him, he was still not fit to travel alone. Apparently, no one undertook to watch McClure while the chief engineer went to get his coat. McClure fell into the water about one hundred feet up the pier near the ship's bow. He was promptly hauled from the water by members of the American Angler's company, but attempts to revive him failed.

Under these circumstances, the District Court found no violation of French law and, alternatively, no negligence on the part of the American Angler's crew. The plaintiff has appealed, contending that the finding of ultimate fact was wrong and reversible, and the Court's construction of French law erroneous.

Article 63 of the French Penal Code imposes criminal sanctions upon one "who voluntarily abstains from giving assistance to a person which he could, without risk either to himself or to third persons, give either by his personal action or by securing assistance." Article 1383 of the French Civil Code imposes civil liabilities for injuries caused by an actor's negligence or imprudence. Apparently, upon the theory that a failure to perform obligations imposed by the Good

Samaritan statute is an imprudence, French treatises declare that one who fails to perform his duty of assistance is subject to civil liabilities under Articles 1382 and 1383 for the resulting harm as well as to the criminal sanctions of Article 63. Thus, one who sees a drowning man in a canal and who, without risk to himself or anyone else, could easily throw him a life preserver, but does nothing, is liable for civil damages.

Professor von Mehren of Harvard Law School, the expert tendered by the plaintiff to prove the French law, testified that there was no precedent for the imposition of liabilities upon one who did not "voluntarily abstain" from rendering assistance, but whose efforts were ineffectual. Since the men here who were attempting to assist McClure had not "voluntarily abstained" from assisting him within the usual connotation of those words, the District Court concluded there was no violation of the French law. Professor von Mehren had testified, however, that implicit in the interrelation between the two articles from the Civil and Criminal Codes was a duty to act with care in rendering the requisite assistance. If harm, he suggested, results from negligent conduct, the actor is liable for it under French law notwithstanding the fact that he was moved to act by recognition of his duty of assistance. The alternative finding of no negligence was responsive to that interpretation of French law.

The resulting questions tendered directly by the appeal, involving a construction of the standard of care required by the French law of one undertaking to perform his duty of assistance, are difficult and divisive. We need not undertake their answers for we hold that American, not French, law must control the result.

Whatever duty French law may have imposed upon members of the crew of the American Angler in their capacities as individuals, it was not the business of the ship or its owner, the defendant here.

■ In American jurisdictions, in cases arising under the Jones Act, it is settled that it is not within the scope of his employment for a seaman to aid an intoxicated member of the same crew in returning to their ship. Re Atlass' Petition, 7 Cir., 350 F.2d 592, cert. denied, Muth v. Atlass, 382 U.S. 988, 86 S.Ct. 551, 15 L.Ed.2d 476; Trost v. American Hawaiian S. S. Co., 2 Cir., 324 F.2d 225, 228; Robinson v. Northeastern S. S. Corp., 2 Cir., 228 F.2d 679.[1] An argument was made and rejected in those cases that a seaman who volunteers to assist a drunken shipmate on land acts for the ship, since the ship, otherwise, might be deprived of the services of the drunken seaman after he has become sober. If it is not the business of his ship for a seaman to assist a drunken shipmate back to their ship, he clearly does not act within the scope of his employment in assisting an intoxicated seaman to return to another ship operated by a different shipping line.

Presumptively, the same result would be reached under French law. Article 1384 of the Civil Code provides in translation, "Masters and employers are liable for the damage caused by their servants and employees in the exercise of the functions for which they have been employed." That Article is unelucidated in this record, but it would appear to supply a rule comparable to the scope of employment rules familiar in the courts of the United States. The plaintiff has not shown a more sweeping application of the French Article.[2]

1. A different result was reached where it was customary for dock guards to detain intoxicated seamen and turn them over to a shipmate, and where the shipowner knew of the practice, acquiesced in it, and authorized its men to escort intoxicated crewmen back aboard ship. See McDonough v. Buckeye S.S. Co., N.D.Ohio, 103 F.Supp. 473, aff'd, 6 Cir., 200 F.2d 558. There is no suggestion of similar circumstances here.

2. In a supplemental memorandum in this court, the attorney for the plaintiff has included excerpts from a letter to him from Professor von Mehren on the ques-

We need not rest decision upon our supposition of the meaning of the un-elucidated French Article, however, or upon the plaintiff's failure to prove that the scope of employment question would be resolved differently in France than in this country. American maritime law, not French law, governs here, and, under that law, the crewmen were not acting within the scope of their employment when rendering assistance to McClure.

This is not a claim by a French citizen, in which France might have a substantial interest. It is a claim by an American widow of an American seaman against the American owner of an American flag vessel. The only French contact with the controversy was France's provision of the stage on which the actors moved. It has no interest in the outcome of this otherwise purely American controversy being litigated in the courts of the United States.

When the United States has played the French role here, the Supreme Court has held that the fact that it provided the site of the alleged wrong is not enough to warrant a choice of American Maritime law. Romero v. International Term. Operating Co., 358 U.S. 354, 381, 79 S.Ct. 468, 3 L.Ed.2d 268, et seq. There, a Spanish seaman on a Spanish flag vessel owned by a Spanish corporation was injured in an American port. The Su-preme Court held American maritime law inapplicable, leaving the plaintiff to present his claim to the Spanish consul in New York for disposition under the laws of Spain. The fact that the injury occurred in territorial waters of the United States was not enough to overcome the countervailing considerations of predominant Spanish contacts with the controversy and Spanish interest in its resolution.

Romero had been forecast by Lauritzen v. Larsen, 345 U.S. 571, 582, 73 S.Ct. 921, 97 L.Ed. 1254, in which there was involved an injury to a Danish seaman on a Danish ship suffered in Cuban waters. There, the only contact of the United States stemmed from the fact that the Danish articles had been signed in New York, but the considerations governing resolution of the choice of law problem, discussed fully in Lauritzen, point to the predominance of other factors than the situs of the tort, as Romero later held.[3]

▪ In the reciprocal situation, when an American seaman on an American vessel is injured in a foreign port, the laws of this country will be applied.[4]

It is true that in Romero the claim was that of a seaman against the ship on which he served, a circumstance emphasized by the court in its opinion, for the rights and duties of a ship and her crew *inter sesse* have long been thought of

---

tion of vicarious liability in France. After stating that the rule there "almost exactly corresponds to that of English law" and after discussing a French case and the writings of several French writers, the Professor ventured the opinion that the "Second Engineer's activity was not in his own interest or for his own purposes but were done in carrying out his duties as an officer of the American Angler." Article 63 of the Criminal Code, however, directed him to act; not the ship. It was entirely in his self interest and for his purposes to comply with the commands of French law directed to him as an individual.

In any event, however, the question of French law was not developed or proven at the trial, and we cannot accept a post-hearing ex parte memorandum as establishing it. Because it had not been made an apparent issue at the trial and because we think American law governs in any event, we do not dispose of this appeal on the basis of a failure of proof of French law on that issue.

3. There are similar holdings in the lower courts. Katelouzos v. The S.S. Othem, E.D.Va., 184 F.Supp. 526; Rankin v. Atlantic Maritime Co., S.D.N.Y., 117 F. Supp. 253; cf. Noel v. Airponents, Inc., D.N.J., 169 F.Supp. 348, in which the laws of the United States were applied in an action by an American against an American corporation for wrongful death of a decedent aboard a Venezuelan airplane which crashed on the high seas as a result of a negligent inspection in the United States.

4. See, e. g., Farmer v. Standard Dredging Corp., D.Del., 167 F.Supp. 381.

primary concern to the nation of the flag.[5] Since the claimant here is an American citizen and her decedent an American seaman serving on an American owned, American flag vessel, the difference affects the nature of the interest of the United States in the controversy, but without substantial diminution of it, while enhancing the French interest in it not in the least. The French interest has no other bottom than the fact that the act which constituted the alleged wrong was done in France. Here, even the consequential, though not the immediate, result of the act, the widow's loss of support and companionship, upon which she claims, was suffered in the United States, but apart from that, all other considerations disclose a strongly predominant American interest and an absence of any possibility of an affront to France or of an effect upon any of her interests by an application of established principles of American maritime law.

█ Moreover, the vicarious liability question, which turns upon the authority and the duties of American seamen to the American vessels upon which they serve, is as peculiarly a matter for resolution under the laws of the flag as if the claimant was a member of the crew of the vessel sought to be held, so long as the claimant is, and her decedent was, of the same nationality as the ship. Had the decedent been French, a reappraisal of all of the relevant considerations would have been requisite, but *Romero* has settled the choice of law question here.

*Romero*, of course, was decided with appropriate concern for the effect upon international relations and the interests of foreign sovereigns of a specific application of the maritime laws of the United States. This case arises in the same context. For the same reasons that the laws of Spain, the nation of the claimant and the ship, were held to be governing there, those of the United States must be the choice of law here.

*Romero's* approach, however, is not limited to a deferential concern for the interests of foreign powers. The same considerations of paramount interests have overturned established principles for the choice of domestic law. The old dialogue that attributed governance to the laws of the place of the wrong [6] has given way to a new concept of assessment of the relative interests of jurisdictions having contacts with the controversy and the parties.[7] *Lauritzen* and *Romero* were forerunners of a general reappraisal and revision of the choice of law rules.[8]

█ Under the new approach the laws of the place of the wrong will be applied in wrongful death and personal injury actions "unless some other state has a more significant relationship with the occurrence and the parties as to the particular issue involved * * *.[9] In some factual situations, the place of the wrong may be quite adventitious, and all really significant relations may be with some other state.[10]

So it is here. All of the really significant relationships are with this country, not with France. France has an obvious interest in the enforcement of Article 63 of her Criminal Code, but no apparent interest in the resolution of this question of the vicarious liability of an American

---

5. See McCulloch v. Sociedad Nacional de Marimeros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547; The Bee, D.Ore., 216 F. 709. When a Greek seaman on a Greek vessel was injured in a German port, we held Greek, not German, law governed. Santorinakis v. The S.S. Orpheus, 4 Cir., 279 F.2d 469.

6. See, Restatement, Conflict of Laws §§ 377, et seq., particularly § 378 and, e. g., Loranger v. Nadeau, 215 Cal. 362, 10 P.2d 63, 84 A.L.R. 1264; Forbes v. Forbes, 226 Wis. 477, 277 N.W. 112.

7. See, Restatement Second, Conflict of Laws (Tentative Draft No. 9, 1964) §§ 379–90.

8. See, id., The Reporter's Note following § 379 at page 15.

9. Id. at §§ 391 and 379(a).

10. See, e. g., Babcock v. Jackson, 12 N.Y. 2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279.

vessel to an American widow of an American seaman.

■ We have already embraced the emergent "significant relationships" doctrine. We said in Lowe's North Wilkesboro Hardware, Inc. v. Fidelity Mut. Life Ins. Co., 4 Cir., 319 F.2d 469, 473, "[W]e find it most reasonable, in these circumstances, to avoid a rigid rule and to pursue instead a more flexible approach which would allow the court in each case to inquire which state has the most significant relationships with the events constituting the alleged tort and with the parties." To the extent, if any at all, that the result here is not strictly dictated by *Romero,* we adhere to that approach in the choice of law generally and apply its principles. The significant contacts with the parties and with the controversy are American, not French. American maritime law is the appropriate choice.

■ In the District Court, where attention was centered upon the question of primary liability, the case was tried upon the assumption that French law controlled the result. Ordinarily, the question of vicarious liability is to be resolved under the laws of that state or nation, whose laws are properly chosen for resolution of the question of the primary liability of the actor, but that is not invariably so.[11] The reasonableness of holding the defendant vicariously liable is open for consideration in the forum. Moreover, the particular issue involved may weigh heavily in the appraisal of the most significant relationships, as the Restatement expressly says.[12]

We need not pursue that subject, however, for we think American maritime law controls the entire case. The contrary assumption of the parties and the District Court is not binding here, certainly not with respect to the unresolved issue of vicarious liability.

■ We are loath to enter final judgment for the ship, however, for the tacit assumption that the case was governed by French law may have had a significant effect upon the making of the record. Justice seems to require a remand to give the parties an opportunity to produce any additional evidence that may be available which has a material bearing upon the issues as defined within the framework of American law. Our conclusion that, on the present record, American law is the appropriate choice may have a decided effect upon the relevance of evidence thought immaterial under French law. Since, too, the choice of law question was not litigated below, the parties should not be foreclosed from the introduction of additional evidence bearing upon that question in the context of the general rules we have discussed. Our decision that American law controls is based upon the present record and does not foreclose reconsideration in the District Court if additional relevant evidence or considerations are produced.

For those purposes, the judgment is vacated and the case remanded for such further proceedings as may be appropriate not inconsistent with this opinion.

Vacated and remanded.

---

11. See Restatement Second, Conflict of Laws (Tentative Draft No. 9, 1964) § 390(f).

12. Id. at §§ 391 and 379(a).