# Implementation of Standstill Agreement Pending Approval of ABM Treaty and ICBM Interim Agreement

The Standstill Agreement, made by the President with the Soviet Union pending congressional approval of the ABM Treaty and the ICBM Interim Agreement, would not violate section 33 of the Arms Control and Disarmament Act, forbidding disarmament except by treaty or act of Congress.

The President is not precluded by contract law or authorization and appropriations legislation passed by Congress from directing the appropriate Executive Branch agencies to abide by the provisions of the arms control agreements pending their coming into force.

June 12, 1972

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This is in response to your oral request for our views concerning certain legal aspects of the Standstill Agreement made with the Soviet Union pending approval by the Congress and the Senate respectively of the Interim Agreement with the USSR on Certain Measures with Respect to the Limitation of Strategic Offensive Arms ("Interim Agreement") and the Treaty with the USSR on the Limitation of Anti-Ballistic Missile Systems ("ABM Treaty").

Although we have not seen the text of the Standstill Agreement, we understand that it is embodied in three documents which have been summarized in the proposed transmittal papers to Congress as follows:

> Both signatories understand that, pending ratification and acceptance, neither will take any action that would be prohibited by the ABM Treaty and the Interim Agreement, in the absence of notification by either signatory of its intention not to proceed with ratification or acceptance.

The ABM Treaty is an agreement not to deploy Anti-Ballistic Missile Systems except for the two described in Article III of the Treaty. The Interim Agreement provides that the United States and the USSR undertake not to start construction of additional fixed land-based intercontinental ballistic missile launchers after July 1, 1972; not to convert land-based launchers for light ICBMs into launchers for heavy types; and to limit the number of missile launching submarines.

## I.

The first question presented is whether the Standstill Agreement would violate the proviso to section 33 of the Arms Control and Disarmament Act. Pub. L. No. 87-297, § 33, 75 Stat. 631, 634 (1961), *codified at* 22 U.S.C. § 2573 (1970). That proviso states:

> That no action shall be taken under this or any other law that will obligate the United States to disarm or to reduce or to limit the Armed Forces or armaments of the United States, except pursuant to the treaty making power of the President under the Constitution or unless authorized by further affirmative legislation by the Congress of the United States.

We believe it reasonable to conclude that the Standstill Agreement does not violate this proviso. A technical argument to the contrary could be made since it might be said to be an obligation to limit the arms of the United States not implemented by treaty or statute.

As indicated in our memorandum to you of June 7, 1972, the proviso to section 33 was intended to prevent the President from acting on his own in making arms limitation agreements. *See, e.g.*, 107 Cong. Rec. 20,308–09 (1961). Here the President is acting closely with the Congress and asking for its approval. On his return after signing the ABM Treaty and the Interim Agreement, he stated to Congress: "[W]e can undertake agreements as important as these only on a basis of full partnership between the executive and legislative branches of our Government." *Transcript of President Nixon's Address to Congress on Meetings in Moscow*, N.Y. Times, June 2, 1972, at 12.

All that the Standstill Agreement seeks to do is to ensure that both the United States and the USSR refrain from acts which would defeat the object and purpose of the Treaty and the Interim Agreement, thus allowing them to be successfully implemented. In doing so the parties are following a generally recognized principle of international law—international agreements should be negotiated in good faith and nothing should be done to undermine them pending their final conclusion. This principle is codified in Article 18 of the Vienna Convention on the Law of Treaties (which the United States has signed but has not yet ratified) as follows:

> A State is obligated to refrain from acts which would defeat the object and purpose of a treaty when:
>
> (a) It has signed the treaty . . . ; or
>
> (b) It has expressed its consent to be bound by the treaty, pending the entry into force of the treaty and provided that such entry into force is not unduly delayed.

Vienna Convention on the Law of Treaties art. 18, *opened for signature* May 23, 1969, 1155 U.N.T.S. 331, 336 (entered into force Jan. 27, 1980).

This custom reflects certain eminently practical considerations. It would be difficult to conclude a successful treaty or interim agreement in the arms control area without an understanding as to what the relationship of the parties should be

pending ratification or acceptance as the case may be; as a result, such understandings, as here, are often reduced to writing. *See* George Bunn, *Missile Limitation: By Treaty or Otherwise?*, 70 Colum. L. Rev. 1, 16 (1970).

It should be noted that the proviso does not state that all arms limitation agreements must be made by treaty or statute. The phrase used in section 33 is "pursuant to the treaty making power of the *President* under the Constitution" (emphasis added). Although treaties can be made only by and with the advice and consent of the Senate, it is the President alone who negotiates. The Treaty Clause therefore confers on him certain independent powers. *See Congressional Oversight of Executive Agreements: Hearing Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92d Cong. at 248–69 (May 18, 1972) (statement of John R. Stevenson, Legal Adviser, Department of State). Under the treaty making power of the President, certain "time-honored diplomatic devices [such] as the 'protocol' which marks a stage in the negotiation of a treaty, and the *modus vivendi*, which is designed to serve as a temporary substitute for one," are recognized. *The Constitution of the United States of America: Analysis and Interpretation*, S. Doc. No. 88-39, at 485 (Edward S. Corwin et al. eds., 1964); *see United States v. Belmont*, 301 U.S. 324, 330 (1937). It is the President's duty in negotiating international agreements to preserve the effectiveness of the treaty making power and to take care that our international obligations are met by arrangements which are designed to preserve the integrity of more lasting arrangements. *Cf. United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936).

The Standstill Agreement is such a stage in negotiations seeking to preserve the status quo and to meet our international obligations pending eventual congressional approval. The Supreme Court has said on a number of occasions that "'an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.'" *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963) (quoting *The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)). We conclude that the proviso to section 33 should not be read to preclude such an arrangement.

## II.

The second question put to us is whether, apart from the matter discussed above, the President is legally precluded from directing the appropriate Executive Branch agencies to abide by the provisions of the ABM Treaty and the Interim Agreement pending their coming into force.

Specifically, this question involves the President's authority to direct executive agencies to take initial steps to terminate current contracts for construction and procurement in projects covered by the ABM Treaty and the Interim Agreement.

We perceive two potential legal objections to this proposal. First, private contractors may object to termination of their construction or procurement contracts with the government for these projects as a matter of contract law. However, since

we understand that all defense contracts are supposed to have termination-for-convenience clauses, the government can simply terminate these contracts as provided in the contracts. Even if this clause were omitted from a contract, the government could still terminate and pay appropriate damages for breach of contract. Thus, there is no insurmountable contractual hurdle in issuing a presidential suspension directive.

A second question involves the constitutional power of the President to terminate projects provided for by authorization and appropriations legislation passed by the Congress. This question in turn raises two subsidiary issues: (1) whether this legislation grants discretion to the President in spending funds or is mandatory in nature; and (2) if mandatory, whether the President possesses constitutional authority to disregard the legislative mandate.

Since the President is under a constitutional obligation to "take Care that the Laws be faithfully executed" (U.S. Const. art. II, § 3), the authorization and appropriations legislation for each of the various projects scheduled for termination must be considered. Although we have not been informed of the specific legislation applicable to the projects involved (except for the ABM installation discussed below), the laws probably will be found to be permissive in nature if they follow the pattern of most spending legislation, particularly defense appropriations in recent years. As a general rule, appropriations acts "are of a fiscal and permissive nature and do not in themselves impose upon the executive branch an affirmative duty to expend the funds." *Federal-Aid Highway Act of 1956—Power of President to Impound Funds*, 42 Op. Att'y Gen. 347, 350 (1967) (Clark, A.G.) (citing cases); *see also McKay v. Cent. Elec. Power Coop.*, 223 F.2d 623, 625 (D.C. Cir. 1955).

One of the projects being considered for immediate termination is presumably the Safeguard ABM installation at Malmstrom Air Force Base at Great Falls, Montana. Secretary Laird recently directed the officials involved to suspend construction at this site. In connection with this directive we have examined the most recent authorization and appropriations legislation governing the Safeguard site.[1] Neither the language of the acts nor the legislative history indicate that Congress intended the spending to be mandatory.

Even if some of the projects in question are, as a matter of statutory construction, interpreted as mandatory in nature, there may be constitutional authority for the President's refusal to expend additional funds. This Office has previously advised that the President has authority to impound funds if their expenditure would conflict with his powers and responsibilities as Commander in Chief and his primary role in international relations. Whether Congress can force the President to spend appropriated funds in these cases is not likely to be tested directly in any

---

[1] Military Procurement Authorization Act, 1972, Pub. L. No. 92-156, 85 Stat. 423; Department of Defense Appropriation Act, 1972, Pub. L. No. 92-204, 85 Stat. 716.

event. Because this matter involves delicate questions concerning the separation of powers between the two political branches of government, the Supreme Court has not, nor is likely to, pass on this question. We believe, however, that the weight of historical precedent indicates that the President possesses the power to impound funds touching on the national defense and foreign relations.

Precedents for presidential impoundment in this area are numerous. In 1949, for example, Congress voted to increase the Air Force from 48 to 58 groups. President Truman signed the bill but directed the impoundment of the extra $614 million appropriated. President Truman also cancelled the construction of an aircraft carrier designed to carry nuclear bombers by exercising his power as Commander in Chief to direct that strategic nuclear bombing be exclusively an Air Force mission. And in 1956 the Defense Department declined to implement a congressional appropriation earmarked for the construction of 20 superfort bombers.[2]

In this light, the suspension of further work on projects covered by the agreements through the impounding of appropriated funds appears within the President's constitutional powers, even if Congress did intend that a specific appropriation should be mandatory.

RALPH E. ERICKSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[2] These examples and others are discussed in the following articles: Frank Church, *Impoundment of Appropriated Funds: The Decline of Congressional Control over Executive Discretion*, 22 Stan. L. Rev. 1240, 1242–44 & nn. 21–22 (1970); Harry Kranz, *A 20th Century Emancipation Proclamation: Presidential Power Permits Withholding of Federal Funds from Segregated Institutions*, 11 Am. U. L. Rev. 48, 65 n.122 (1962); Arthur Selwyn Miller, *Presidential Power to Impound Appropriated Funds: An Exercise in Constitutional Decision-Making*, 43 N.C.L. Rev. 502, 513 (1965).