**NATIONAL TRANSPORTATION SAFETY BOARD, Petitioner,**

v.

**CARNIVAL CRUISE LINES, INC., Edouardo Casale, Edwin Diaz, Robert Hamil, and Pietro D. Dodero, Respondents.**

**No. 89–1413–CIV.**

United States District Court, S.D. Florida, Miami Division.

Oct. 20, 1989.

Guy W. Harrison, Asst. U.S. Atty., Miami, Fla., for petitioner.

John W. Keller, III and Charles G. De-Leo, Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A., Miami, Fla., for Carnival Cruise Lines, Inc.

## MEMORANDUM ORDER

RYSKAMP, District Judge.

This cause is before the court upon petition of the National Transportation Safety Board ("NTSB" or "Board") to enforce certain subpoenas and upon motion of the respondents, Carnival Cruise Lines, Inc. ("Carnival") and Edwin Diaz,[1] to dismiss the petition and quash the subpoenas. The court has reviewed the memoranda submitted by the parties and has had the bene-

fit of oral argument on this matter. For reasons articulated below, the petition to enforce subpoenas is denied and the motion to dismiss is granted.

## FACTUAL BACKGROUND

On February 10, 1989, a collision occurred between two foreign-flagged vessels traveling in international waters near the coast of Cuba. One of the vessels, the M/V Celebration, is a 733-foot passenger cruise ship registered in Liberia. The other vessel, the M/V Capitan San Luis, was a 352-foot bulk carrier registered in Cuba. At the time this collision occurred, the M/V Celebration was carrying more than 1500 passengers, primarily United States citizens. When the vessels collided, the Cuban freighter was severed into two parts, both of which sank, and one of the ship's officers and two crewmen were killed. Although the Liberian cruise ship incurred over $1 million dollars worth of damage, it returned safely to port and none of its passengers were fatally injured. To date, the cause of this accident remains undetermined.

The NTSB is an agency of the United States government authorized to investigate certain transportation accidents and to determine the cause or probable cause of such accidents.[2] On February 11, 1989, the NTSB dispatched one of its investigators to Miami, Florida, where the M/V Celebration was in port, to investigate this accident. The NTSB investigator met with a representative from the Liberian Bureau of Maritime Affairs who was conducting an investigation of the accident on behalf of Liberia.

The Liberian government permitted the NTSB to conduct an investigation of the accident in conjunction with its investigation.[3] Furthermore, counsel for Carnival Cruise Lines, Inc., the Panamanian corpora-

---

1. The respondents, Edouardo Casale, Robert Hamil, and Pietro D. Dodero, have not filed a response in this action.

2. 49 U.S.C.A.App. §§ 1901 and 1903(a)(1).

3. For example, the Liberian government permitted the NTSB to participate in the questioning of

several crew members who were on board the M/V Celebration when the accident occurred. Additionally, the NTSB investigator accompanied the Liberian investigating officer when he met with representatives of the manufacturer that installed the radar equipment on the ship.

tion that operates the M/V Celebration, agreed to allow the NTSB to interview several of the ship's crew members. However, this consent was subsequently withdrawn after the crew members were informed by the Liberian investigating officer that their involvement in the collision may result in the suspension or revocation of their licenses.

Nevertheless, the NTSB maintained that the crew members possessed information and documentation concerning the collision that was unobtainable from any other source. The Board then issued subpoenas to the respondents, Edouardo Casale, chief officer of the M/V Celebration; Edwin Diaz, the helmsman; Robert Hamil, cruise director; and Pietro D. Dodero, director of marine operations and records custodian for Carnival, compelling their attendance for testimony and production of evidence. When the respondents refused to comply with the subpoenas, the NTSB instituted this action seeking a court order compelling the respondents' compliance.

## INTRODUCTION

Pursuant to its enabling statute, the Independent Safety Board Act ("Act"), codified at 49 U.S.C.A.App. § 1901 *et. seq.* (1974), the NTSB clearly has authority to investigate any major marine accident occurring in United States territory or involving a United States vessel.[4] 49 U.S.C.A. App. § 1903(a)(1)(E). In this case, however, the NTSB seeks to exercise its authority extraterritorially to investigate an accident that occurred in international waters between foreign-flagged vessels. To determine whether the NTSB may properly conduct such an investigation, this court must consider whether Congress has the power to confer such authority on the NTSB, and if so, whether Congress has chosen to exercise such power.

**4.** Accidents involving only public vessels are expressly excluded. 49 U.S.C.A.App. § 1903(a)(1)(E).

## LEGAL ANALYSIS

I. Congressional Power to Authorize an Investigation

Generally, the "law of the flag" governs the occurrences on board a ship as though the ship were a part of the territory of the flag-state. *See Lauritzen v. Larsen,* 345 U.S. 571, 585, 73 S.Ct. 921, 929, 97 L.Ed. 1254, 1269 (1953); *see also McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21, 83 S.Ct. 671, 677, 9 L.Ed.2d 547, 555 (1963); *Restatement (Third) of the Foreign Relations Law of the United States* § 502 (1986). When a state grants its nationality to a ship, the state accepts responsibility for the ship and acquires authority over it. *Lauritzen,* 345 U.S. at 584, 73 S.Ct. at 929, 97 L.Ed. at 1269. However, the fact that Liberia, the flag-state of the M/V Celebration, has both the right and the obligation to investigate this accident does not necessarily preclude the United States from conducting an investigation of its own.

◼ In international law, territoriality is a generally accepted basis for exercising jurisdiction to prescribe law. *Restatement (Third) of Foreign Relations Law of the United States* (1986) § 402, Comment *a.*[5] However, under certain circumstances, conduct outside the territory of a state which has an effect within that state's territory may also provide a basis for exercising jurisdiction to prescribe. According to the most recent Restatement, the "effects doctrine" provides jurisdiction to prescribe law with respect to conduct outside the territory of a state if the conduct has a "substantial effect within its territory," and the exercise of such jurisdiction is not "unreasonable." *See Restatement (Third) of the Foreign Relations Law of the United States* (1986), §§ 402(1)(c) and 403(1) and (2). However, the previous Restatement, which was widely accepted, imposed a more stringent standard for the exercise of jurisdiction based upon the "effects doctrine."

**5.** Although the Restatement is not a binding source of law, courts often rely upon it as "an accurate articulation of international law." Rosenthal, *Jurisdictional Conflicts Between Sovereign Nations,* 19 INT'L LAW. 487, 488 (1985).

According to the Second Restatement, a state may only exercise jurisdiction on this basis when the conduct that occurs outside its territory causes an effect within its territory that is "substantial," and "occurs as a direct and foreseeable result of the conduct outside its territory." *See Restatement (Second) of the Foreign Relations Law of the United States* (1965) § 18. Pursuant to either of these standards, however, it appears that Congress may indeed have jurisdiction to prescribe law authorizing investigations of accidents in circumstances such as this.

Carnival, the corporation that operates the M/V Celebration, engages in a substantial business in this country, evidenced in part by the fact that the overwhelming majority of its passengers are United States citizens. Moreover, the M/V Celebration regularly operates in United States territory and its cruises originate and terminate in our ports on a regular basis. Finally, and most significantly, this accident jeopardized the safety of more than 1500 passengers, primarily United States citizens. Clearly, the conduct of Carnival, and similar cruise lines, has a substantial, direct, and foreseeable effect in the territory of the United States, and it would appear reasonable for Congress to prescribe legislation authorizing the NTSB to investigate accidents such as this.[6] However, the dispositive question is whether Congress has chosen to exercise that power.

## II. Congressional Exercise of its Power to Authorize an Investigation

Since the NTSB is a creature of statute, its sole source of authority derives from its enabling act. Therefore, any congressional exercise of power authorizing an investigation of this accident will necessarily be found in that Act. To determine whether the Board is authorized to investigate this particular accident, the court must examine the statute to determine whether it authorizes an extraterritorial investigation of an accident that occurred in international waters between foreign-flagged vessels. The relevant section of the Act provides that:

(a) The Board shall—

(1) investigate or cause to be investigated (in such detail as it shall prescribe), and determine the facts, conditions, and circumstances and the cause or probable cause or causes of any—

(A) aircraft accident which is within the scope of the functions, powers, and duties transferred from the Civil Aeronautics Board under section 1655(d) of this title pursuant to title VII of the Federal Aviation Act of 1958, as amended;

(B) highway accident, including any railroad grade crossing accident, that it selects in cooperation with the States;

(C) railroad accident in which there is a fatality, substantial property damage; or which involves a passenger train;

(D) pipeline accident in which there is a fatality or substantial property damage;

(E) major marine casualty, except one involving only public vessels, occurring on the navigable waters or territorial seas of the United States, or involving a vessel of the United States, in accordance with regulations to be prescribed jointly by the Board and the Secretary of the department in which the Coast Guard is operating. ...; and

(F) other accident which occurs in connection with the transportation of people or property which, in the judgment of the Board, is catastrophic, involves problems of a recurring charac-

---

6. It should be noted that since the NTSB is not a regulatory agency, it does not seek to implement or enforce safety standards governing this ship. The Board is only empowered to conduct accident investigations and to formulate safety improvement recommendations. 49 U.S.C.A.App. § 1901(1). Nevertheless, the Restatement suggests that when a ship regularly calls on the United States it may not be unreasonable for our Government to prescribe legislation permitting safety inspections and regulating the safety standards of such ships. *See Restatement (Third) of the Foreign Relations Law of the United States* (1986) § 403, Comment *c*, and Reporters' Note 4.

ter, or would otherwise carry out the policy of this chapter.

49 U.S.C.A.App. § 1903(a)(1).

In construing this statute to determine whether it permits an extraterritorial investigation in this case, the court notes that in the "delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed." *McCullogh,* 372 U.S. 10 at 21–22, 83 S.Ct. at 671, 678, 9 L.Ed.2d at 547, 555 (quoting *Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709, 715 (1957)).[7] Thus, this court must apply the well-established rule of statutory construction that Congress, unless a contrary intent appears in the statute, is presumed to intend only territorial application of a statute. *Foley Bros. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949).

■ The only provision of the Act that explicitly addresses the Board's authority to investigate marine accidents is found at 49 U.S.C.A.App. § 1903(a)(1)(E). That subsection specifically limits the NTSB's authority to conduct extraterritorial investigations to those accidents "involving a vessel of the United States." Consequently, nothing in the statute's express language indicates that Congress intended to authorize the NTSB to conduct extraterritorial investigations of marine accidents that do not involve a United States vessel. Nor does the legislative history of this Act disclose any affirmative congressional intent to confer such authority. In the absence of such intent, it must be presumed that Congress intended only territorial application of this statute, unless a United States vessel is involved. *Foley,* 336 U.S. at 285, 69 S.Ct. at 577.

Despite the absence of express statutory language or legislative history evincing an intent to authorize an investigation of this accident, the NTSB nevertheless urges this court to construe the statute in this man-

ner. To support this construction, the Board points out that subsection (F) authorizes it to investigate "any" transportation accident which, in the judgment of the Board, is "catastrophic, involves problems of a recurring character, or would otherwise carry out the policy of [the Act]." *See* 49 U.S.C.A.App. § 1903(a)(1)(F). The Board asserts that subsection (F) must be construed as broadening its investigative jurisdiction to authorize an extraterritorial investigation involving a foreign-flag vessel. According to the NTSB, when it relies upon subsection (F) for its investigative authority, the only relevant inquiry is whether a transportation accident occurred that the Board deems to be "catastrophic," "of a recurring character," or one which should be investigated to "carry out the policy of [the Act]."

However, as the respondents contend, if this statute is read literally as the NTSB suggests, it would confer essentially unlimited jurisdiction on the Board to investigate any transportation accident occurring anywhere in the world, irrespective of its situs. In light of the jurisdictional limitations expressed in subsections (A)–(E), this court cannot conclude that in subsection (F) Congress intended, by its silence, to confer on the NTSB carte blanche authority to investigate any transportation accident that occurs anywhere in the world in the name of transportation safety.

Although the court rejects the literal interpretation suggested by the NTSB as being overly simplistic and contrary to congressional intent, the court recognizes its obligation to construe this statute, if possible, so as to give it meaningful effect. *National State Bank of Elizabeth, N.J. v. Smith,* 591 F.2d 223 (3rd Cir.1979). A review of the statute, its legislative history, and the regulations promulgated thereunder indicate that Congress did not enact subsection (F) to broaden the NTSB's ex-

---

7. Although the court assumes, without deciding, that legislation authorizing an investigation of this accident may be justified under these circumstances by relying upon the "effects doctrine," the court recognizes that this doctrine has been criticized abroad. *See* Kathleen Hix-

son, *Extraterritorial Jurisdiction under the Third Restatement of Foreign Relations Law of the United States,* 126 Fordham Int'l Law J. 127, 138–139 (1988). Thus, an exercise of jurisdiction on this basis may implicate sensitive issues of international law.

traterritorial jurisdiction. Rather, it appears Congress enacted this subsection to confer discretionary authority on the Board to investigate accidents that do not meet the specific criteria delineated in subsections (A)–(E), but should nevertheless be investigated because they are "catastrophic," "recurring," or because an investigation would "carry out the policy of [the Act]."

For example, in the absence of subsection (F), the Board would only be permitted to investigate a railroad accident in which there were "a fatality, substantial property damage; or which involves a passenger train." 49 U.S.C.A.App. § 1903(a)(1)(C). However, by enacting subsection (F), Congress conferred discretionary authority on the Board to investigate "any other" railroad accident that does not satisfy the criteria of subsection (C) but is "catastrophic," "recurring," or one that should be investigated to promote transportation safety. Similarly, in the absence of subsection (F), the Board would only be permitted to investigate a "major marine casualty ... occurring on the navigable waters or territorial seas of the United States, or involving a vessel of the United States." [8] 49 U.S.C.A.App. § 1903(a)(1)(E). However, in subsection (F), Congress conferred discretionary authority on the Board to investigate "any other" marine accident occurring in United States territory or involving a United States vessel, even if the accident does not meet the criteria of a "major marine casualty," as long as the accident is "catastrophic," "recurring," or one which should be investigated to "carry out the policy of [the Act]."

Moreover, this construction of the statute comports with the legislative history pertaining to subsection (E). The history of that subsection indicates that initially, the drafters of this bill employed general language proposing that the NTSB have authority to investigate "marine casualt[ies]" occurring in United States territory or involving a United States vessel. *See e.g.*, S.Rep. No. 93–1192, 93rd Cong., 2d Sess., and *see* 120 Cong.Rec. 34094 (1974). However, the Act ultimately passed by Congress specifically limited the NTSB's authority to conducting investigations of "major marine casualt[ies]." 49 U.S.C.A. App. § 1903(a)(1)(E). The Senate conference report indicates that this modification was made both to outline the nature of marine accidents the Board shall investigate, and was done in deference to the Merchant Marine and Fisheries Committee of the House, which has jurisdiction over the Coast Guard. *See* S.Conf.Rep. No. 93–1347, *reprinted in* 1974 U.S.Code Cong. & Admin.News 7669, 7697. Thus, as enacted, subsection (E) appears to strike a balance between the authority granted to the NTSB and to the Coast Guard to conduct investigations of marine accidents.[9] Nonetheless, by enacting subsection (F), Congress conferred discretionary authority on the Board to investigate an accident that is not a "major marine casualty," if it is deemed to be "catastrophic," "recurring," or one

**8.** A "major marine casualty" is defined in 49 C.F.R. § 850.5 (1977, amended 1982) as:

(e) ... a casualty involving a vessel, other than a public vessel, that results in—
(1) The loss of six or more lives;
(2) The loss of a mechanically propelled vessel of 100 or more gross tons;
(3) Property damage initially estimated as $500,000 or more; or
(4) Serious threat, as determined by the Commandant [of the Coast Guard] and concurred in by the Chairman [of the National Transportation Safety Board], to life, property, or the environment by hazardous materials.

**9.** Prior to the passage of this act, the Coast Guard was responsible for conducting investigations of marine accidents, while the NTSB was granted authority to "determin[e] the cause or probable cause of transportation accidents and repor[t] the facts, conditions, and circumstances relating to such accidents." *See* H.R.Rep. No. 1701, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin.News 3362, 3401–02; and *see* Department of Transportation Act of 1966, Pub.L. No. 89–670, § 5(b)(1), *reprinted in* 1966 U.S.Code Cong. & Admin.News (80 Stat.) 931, 1106. Although the present Act permits the NTSB to conduct investigations, its authority is primarily limited to investigations of "major marine casualt[ies]." The Coast Guard retains primary responsibility for investigating marine casualties that are not within the purview of the statutorily defined term "major marine casualty." *See generally* 49 C.F.R. § 850.1 *et seq.* (1977, amended 1982).

**1494**

which should be investigated to "carry out the policy of [the Act]."

In sum, the NTSB asserts that subsection (F) should be construed to broaden the Board's investigative jurisdiction and thus permit it to conduct an investigation of this accident. However, neither the statute nor its legislative history indicates that Congress has exercised its power to authorize the NTSB to investigate a marine accident occurring in international waters between foreign-flagged vessels.

Because this interpretation of the statute is dispositive of this case, it obviates the necessity of addressing the other arguments presented by the parties.

## CONCLUSION

This court recognizes that permitting the NTSB to investigate this, and similar accidents, may be in the best interest of the American traveling public by tending to promote transportation safety. However, the Act, as presently drafted, simply does not authorize the NTSB to conduct an investigation of this particular accident, and it is not within the province of this court to confer such authority on the Board when Congress has not done so.

Because the NTSB is without jurisdiction to investigate this accident, the Board exceeded its authority in issuing subpoenas to the respondents compelling them to appear to testify and produce documentation concerning this collision. Accordingly, after careful consideration of this matter, it is hereby:

ORDERED and ADJUDGED that the petition to enforce subpoenas is DENIED and the motion to dismiss the petition and to quash the subpoenas issued to the respondents is GRANTED.

DONE and ORDERED.