NATIONAL LABOR RELATIONS
BOARD

v.

INTERSTATE DRESS CARRIERS, INC.

Cloak and Dress Drivers and Helpers Union Local 102, International Ladies' Garment Workers' Union, Intervenor in D.C.,

Union Local 20408 United Warehouse, Industrial and Affiliate Trades, Intervenor in D.C.

Appeal of NATIONAL LABOR RELATIONS BOARD and Arthur Eisenberg, Plaintiff and Counterclaim Defendants.

No. 79–1321.

United States Court of Appeals,
Third Circuit.

Argued May 3, 1979.

Decided July 19, 1979.

As Amended Aug. 22, 1979.

Margery E. Lieber, Deputy Asst. Gen. Counsel for Special Litigation (argued), Susan Tepper Papadopoulas, Atty., N. L. R. B., Washington, D. C., for N. L. R. B.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Interstate Dress Carriers, Inc.; Martin London, New York City, argued; Rosen, Gelman & Weiss, Newark, N. J., of counsel.

Ball, Hayden, Kiernan & Livingston, Newark, N. J., for Union Local 20408; Craig H. Livingston, Newark, N. J., argued.

Ernest Allen Cohen, Teaneck, N. J., for Local 102 International Ladies' Garment Workers' Union; Marchi, Jaffe, Cohen, Crystal & Katz, New York City, of counsel.

Before ADAMS, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

The National Labor Relations Board and Arthur Eisenberg, Regional Director (the Board) appeal from an order of the District Court for the District of New Jersey enjoining the Board from opening or counting ballots in a representation proceeding, and ordering discovery of facts bearing on the validity of that proceeding. We reverse the grant of injunctive relief.

### I. FACTS AND PROCEEDINGS IN THE DISTRICT COURT

On February 13, 1979, the Board applied to the district court, pursuant to § 11(2) of the National Labor Relations Act (NLRA), 29 U.S.C. § 161(2), for an order requiring Interstate Dress Carriers, Inc. (IDC) to obey a subpoena duces tecum issued in connection with a representation proceeding involving IDC employees. The subpoena called for the production of an "Excelsior List" of the names and addresses of all

employees in a specified bargaining unit.[1] The representation proceeding involved an effort by Local 20408 of the United Warehouse Industrial and Affiliate Trades Employees Union (Local 20408) to be certified as the bargaining representative for IDC employees in place of Cloak, Dress Drivers and Helpers Union, Local 102, International Ladies' Garment Workers' Union (Local 102), with which IDC had a collective bargaining agreement. The Board's application to the district court disclosed that an election was scheduled for February 21, 1979. On February 14, the district court issued an order directing IDC to show cause why the subpoena duces tecum should not be enforced. IDC appeared before the district court the following day, informed the court of its intention to file an answer and counterclaim, an opposing affidavit, a motion for a temporary injunction and a supporting memorandum of law. At that time IDC requested, and was granted, a one-day adjournment in which to prepare and file its papers.

On February 16, IDC filed an answer and counterclaim in which it admitted the pendency of the representation proceeding and the scheduled election. IDC alleged, however, that the hearings held by Region Twenty-Two of the Board, which culminated in the decision to call an election, were conducted with such procedural irregularities as to deprive IDC of an opportunity to be heard, offer evidence, and examine witnesses. It alleged that if its existing collective bargaining relationship with Local 102 were to be terminated as a result of the election, it would suffer irreparable injury for the redress of which there was no adequate remedy. IDC sought a declaratory judgment that the Board proceedings violated due process and the Administrative Procedure Act, an injunction to prohibit the Board from conducting any election and any proceeding ancillary thereto, and the dismissal of the Board's application to enforce the subpoena.

On February 20, 1979, the trial court entertained argument on IDC's motion for a preliminary injunction against the election scheduled the next day. On the same day, Local 102 and Local 20408 moved to intervene, and Local 102 joined in IDC's request for preliminary relief. Also on February 20, the Board moved to dismiss IDC's counterclaim for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.

The district court, by order dated February 20, 1979: (1) permitted both unions to intervene; (2) denied the motion for a preliminary injunction against holding the election scheduled on February 21, 1979; (3) denied the Board's motion to dismiss the IDC counterclaim for lack of subject matter jurisdiction "without prejudice to renewal after completion of discovery and pretrial conference"; (4) reserved decision on the Board's application to enforce its subpoena; (5) directed the Clerk of the district court to turn over the Excelsior List, which had been delivered to the Clerk, to the Board's attorney for the purpose of determining eligibility to vote at the February 21, 1979 election; (6) ordered the Board to seal all ballots cast at the election "without opening them or tallying the results" and to "keep them under seal pending the further order of this Court"; (7) ordered that discovery go forward and be completed by May 11, 1979, and that a pretrial conference take place on May 22, 1979. The net effect of this order was to permit the February 21, 1979 election to take place, using an Excelsior List obtained from IDC, but to prevent the Board from counting the ballots or certifying a bargaining agent for at least ninety days thereafter.

The Board filed a notice of appeal on February 26, 1979. It also moved for a stay of the court's injunction and discovery order pending appeal. Meanwhile, IDC and Local

---

1. The Board's policy, established in *Excelsior Underwear, Inc.*, 156 NLRB 1236 (1966), is to require an employer to provide it with the names and addresses of all employees eligible to vote in a scheduled election. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *NLRB v. Delaware Valley Armaments, Inc.*, 431 F.2d 494 (3d Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 354, 27 L.Ed.2d 265 (1970).

102 had moved before the Board for review of the Regional Director's decision to hold an election and for an order impounding the ballots pending decision on their request for review. On March 6, 1979, the Board denied the IDC and Local 102 requests for review and for an impoundment order. On March 9, 1979, these developments were brought to the district court's attention at a hearing on the Board's motion for a stay. Motions for a stay of the order impounding the ballots and for a stay of discovery were denied on March 9, 1979.

## II. PROCEEDINGS IN THIS COURT

On March 12, 1979, the Board filed in this Court a motion for a stay pending appeal. By agreement of the parties, depositions of Regional Director Eisenberg and hearing officer Anderson, previously noticed, were adjourned pending our ruling on that motion. IDC also noticed the deposition of Matthew Eason, president of Local 20408, and, when he did not appear, obtained an order from the district court directing that Eason appear, or certain disputed facts would be deemed established against that Local. Local 20408 also moved in this Court for a stay pending appeal. On March 21, we entered orders staying all discovery; but in order not to render moot the appellees' claim that the Board's subpoena should not have been enforced, on April 24, by order of Chief Judge Seitz, we continued in effect the order staying counting of the ballots.

## III. PROCEEDINGS IN OTHER COURTS

IDC and others have been charged in an indictment pending in the Eastern District of New York with violations of 18 U.S.C. §§ 1505 and 371. The indictment alleges that IDC and others have attempted to interfere with the Board's representation case, in which the subpoena here in dispute was issued, by bribes and threats intended to induce Local 20408 to withdraw its representation petition. In that proceeding IDC, pursuant to Fed.R.Crim.P. 17, subpoenaed the authorization cards submitted to the Board by Local 20408 in support of its representation petition. The Rule 17 subpoena was resisted by the Board on the ground of privilege. The Board's motion to quash was denied, and the Court of Appeals for the Second Circuit withheld appellate and mandamus relief. *United States v. Di Lapi*, 595 F.2d 1209 (2d Cir. 1979). The General Counsel continued to resist and was held in contempt. On appeal from that decision, the Second Circuit held that the authorization cards and some other papers bearing upon Local 20408's representative status must be disclosed to the defendants in the criminal case, despite the existence of a recognized privilege against disclosing the identity of employees signing authorization cards. *In re John S. Irving, General Counsel*, 600 F.2d 1027 (2d Cir. 1979).

The indictment pending in the Eastern District of New York and the related contempt proceedings are claimed by IDC and Local 102 to be relevant to the disposition of this appeal because, these parties contend, they establish that the representation hearings before the Board, in which the subpoena in this case issued, are a sham, instigated at the behest or with the connivance of the prosecutor in the Eastern District of New York.

## IV. APPEALABILITY

IDC contends that we should dismiss the Board's appeal for lack of an appealable order. The Board, on the other hand, contends that the February 20, 1979 order is appealable under 28 U.S.C. § 1292(a)(1) as the grant of an injunction, and that, in any event, the district court's assertion of continuing jurisdiction on the basis of a counterclaim over which it lacks subject matter jurisdiction is reviewable pursuant to 28 U.S.C. § 1651.

As we noted above, the form of the district court's order permitted the election to go forward, while preventing the counting of the ballots until after the court had considered the merits of IDC's defense to the subpoena and its counterclaim for injunctive relief against the election. IDC points out, quite correctly, that the district

court has not so far expressed a viewpoint on the merits of the Board's application for enforcement of the subpoena or on the merits of the counterclaim. For that reason, it contends, the February 20 order is not yet ripe for appeal. But whether a court order actually addresses the merits of a particular dispute is hardly dispositive. Although, in granting pendente lite injunctive relief, a trial court is required as a matter of law to take into account the moving party's likelihood of success on the merits, courts frequently will refrain from actually ruling on the merits. The purpose of § 1291(a)(1) jurisdiction is review of pendente lite injunctive relief, not review of final judgments. Here, read practically, the trial court's order of February 20 plainly provided preliminary injunctive relief. By permitting the Board to use IDC's Excelsior List, but directing that the results of the balloting be impounded until its further order, the court accomplished the result of disrupting the Board's certification proceeding as completely as if it had fully granted all the preliminary injunctive relief for which IDC had moved. Whichever local won the February 21, 1979 election has been left in limbo in the meantime for over 90 days. In effect, the court granted a lesser form of relief than IDC had requested, but that relief could fairly be construed to be within the scope of IDC's original demand. A preliminary injunction which does not direct all that a plaintiff asks is, however, still a preliminary injunction. It is the court's coercive order, and that alone, which prevents the Board from completing the pending representation proceeding. That order, no matter how disingenuously IDC and Local 102 choose to describe it, did not merely continue the case without reaching the merits. It is a preliminary injunction within the meaning of § 1292(a)(1). Were we to hold otherwise, we would put in the hands of trial courts the power, by legerdermain in the framing of orders, to deprive litigants of their right to appellate review of effective preliminary injunctions, a right which Congress intended to give them.

▇▇ It does not follow, however, that because the impoundment order is reviewable as a grant of a pendente lite injunction, the other features of the February 20 order, and particularly the provision permitting discovery, are also reviewable at this time. Discovery orders are not ordinarily appealable. *E. g., Borden Co. v. Sylk*, 410 F.2d 843 (3d Cir. 1969). We must, of course, in reviewing the propriety of the order impounding the ballots, consider whether the court had subject matter jurisdiction to entertain any cause of action which would sustain it. *See, e. g., Orth v. Transit Inv. Corp.*, 132 F.2d 938, 944 (3d Cir. 1942); *Eighth Regional War Labor Board v. Humble Oil & Refining Co.*, 145 F.2d 462, 464 (5th Cir. 1944), *cert. denied*, 325 U.S. 883, 65 S.Ct. 1577, 89 L.Ed. 1998 (1945). We can, moreover, in reviewing the preliminary injunction, consider whether any pleading stated a claim upon which any relief could be granted, and thus whether any discovery at all was warranted. Naturally, if subject matter jurisdiction is entirely lacking or the pleadings disclose no claim upon which relief could be granted, the discovery order will fall along with the rest. But if, on any theory, the court has some jurisdiction for which discovery would be appropriate, and if some colorable pleading has been filed, the discovery order is interlocutory and unreviewable. Moreover, if there is jurisdiction and a pleading sufficient to justify discovery, we do not think that appellate intervention by way of mandamus under 28 U.S.C. § 1651 is appropriate. Ordinarily, mandamus is not to be used as a substitute for appeal, particularly where, as in the case of a lawful discovery order, appellate review is foreclosed. *See, e. g., Prop-Jets, Inc. v. Chandler*, 575 F.2d 1322, 1324 (10th Cir. 1978); *Nixon v. Sirica*, 159 U.S.App.D.C. 58, 64, 487 F.2d 700, 706 (1973).

## V. SHOULD THE COURT HAVE HALTED THE REPRESENTATION CASE?

The court's power to order impounding of the ballots can arise from two sources only: The IDC counterclaim with respect to the manner in which the representation case was conducted, or the IDC defense to the Board's subpoena enforcement application.

### A) The Counterclaim

■ Representation proceedings are conducted by the Board pursuant to § 9 of the NLRA, 29 U.S.C. § 159. Because of the compelling interest in moving collective bargaining forward in an expeditious manner, Congress included no express provision for immediate judicial review of a representation decision. *See* Goldberg, *District Court Review of NLRB Representation Proceedings*, 42 Ind.L.J. 455, 456 (1967). Review is available to an employer only if, after the Board certifies a collective bargaining agent, the employer commits an unfair labor practice by refusing recognition and either the Board proceeds against it under § 10(e) of the NLRA, 29 U.S.C. § 160(e), or the employer, as a "person aggrieved by a final order of the Board," seeks appellate review under § 10(f), 29 U.S.C. § 160(f). When this procedure is followed, jurisdiction to review the representation case lies exclusively in the courts of appeals, and the underlying representation proceedings are included in the record on review by virtue of § 9(d), 29 U.S.C. § 159(d). *Boire v. Greyhound Corp.*, 376 U.S. 473, 477, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). Then, and only then, is review of the Board's representation decisions typically available for the protesting employer.

This statutory scheme was designed by Congress to prevent the delays in the election and certification process that were thought to be inevitable if frequent recourse to pre-election review were permitted. The 74th Congress, which enacted the National Labor Relations Act, expressed widespread disappointment with those portions of Public Resolution 44—the legislation creating the first National Labor Relations Board—which had empowered the Board to conduct representation elections and had provided for immediate judicial review in the courts of appeals of any Board order directing an election. The Senate Report on the Wagner Act declared:

*Obstacles to elections*—Under Public Resolution 44, any attempt by the government to conduct an election of representatives may be contested *ab initio* in the courts, although such election is in reality merely a preliminary determination of fact. This means that the government can be delayed indefinitely before it takes the first step toward industrial peace. After almost a year not a single case, in which a company has chosen to contest an election order of the Board, has reached decision in any circuit court of appeals.

S.Rep.No.573, 74th Cong., 1st Sess. 5–6 (1935), *quoted in* Goldberg, *supra*, at 460. To like effect, the House Report stated:

The election is but a preliminary determination of fact, and there is no reason why employers should have an opportunity for court review prior to the holding of the election. The ability of employers to block elections has been productive of a large measure of industrial strife.

H.R.Rep.No.972, 74th Cong., 1st Sess. 5 (1935), *quoted in* Goldberg, *supra*, at 461. In place of the immediate, pre-election review available under Public Resolution 44, the NLRA created the current post-election scheme, codified in § 9(d). The Congressional purpose was unmistakable.

Section 9(d) makes it absolutely clear that there shall be no right to court review anterior to the holding of an election. An election is the mere determination of a preliminary fact, and in itself has no substantial effect upon the rights or either employers or employees. There is no more reason for court review prior to an election than for court review prior to a hearing. But if subsequently the Board makes an order predicated upon the election, such as an order to bargain collectively with elected representatives, then the entire election procedure becomes part of the record upon which the order of the Board is based, and is fully reviewable by an aggrieved party in the Federal courts in the manner provided in Section 10. And this review would include within its scope the action of the Board in determining the appropriate unit for purposes of the election. This provides a complete guarantee against arbitrary action by the Board.

S.Rep.No.972, 74th Cong., 1st Sess. 14 (1935), *quoted in* Goldberg, *supra*, at 461–62.[2]

Although Congress indicated its opposition to pre-election review of Board representation decisions, the Supreme Court has, since the promulgation of §§ 9(d) and 10(e) and (f), carved out a limited number of narrow exceptions to that general Congressional rule. The first of these was announced in *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). There, a labor organization sued in district court to overturn a decision of the NLRB which designated within a single collective bargaining unit both professional and nonprofessional employees. It contended that the Board's decision, rendered without first holding a vote among the professional employees to determine whether a majority of them would opt for inclusion in such a unit, violated the clear mandate of § 9(b)(1) of the NLRA. The Board defended on the ground that, in the absence of an unfair labor practice citation, there was no jurisdiction in the district court to entertain such a challenge. The Supreme Court disagreed. The labor organization's suit, the Court declared, was not one in the nature of review of a Board ruling, but rather was "one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition of the Act." 358 U.S. at 188, 79 S.Ct. at 184. The Court thus distinguished the case at bar from other cases, most notably *American Federation of Labor v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1939), which had held that a Board order in certification proceedings under § 9 is not a final order for purposes of review except insofar as it may be drawn in question by a petition for enforcement or review of an order under § 10. Because the challenge in *Kyne* was addressed to the very existence of Board power, as opposed to its exercise of that power, the Court held that an independent suit in the district court could be maintained. In so ruling the Court was particularly moved by its belief that the members of the labor organization would have "no other means, within their control . . . to protect and enforce [their] right[s]" as professional employees. *Id.* 358 U.S. at 190, 79 S.Ct. at 184.

*Leedom v. Kyne* provides small comfort to IDC insofar as its counterclaim is concerned. First, it is not clear that the Court intended that employers, who do, after all, have a statutory means of review pursuant to §§ 9 and 10, be able to assert pre-election suits under *Kyne*. Rather, it stressed the peculiar hardship which confronted the plaintiff labor organization, precluded as it was from alternative post-election appellate review. Employers face no such hardship.

But even were pre-election suits available to employers under *Kyne*, the IDC counterclaim on file when the district court acted could not support that court's exercise of jurisdiction.[3] IDC's counterclaim does

---

2. The House Report reiterated this position:

As previously stated in this Report, the efficacy of Public Resolution 44 has been substantially impaired by the provision for court review of election orders prior to the holding of the election. Section 9(d) of the bill makes clear that there is to be no court review prior to the holding of the election, and provides an exclusive, complete and adequate remedy whenever an order of the Board made pursuant to section 10(c) is based in whole or in part on facts certified following an election or other investigation pursuant to section 9(c). The hearing required to be held in any such investigation provides an appropriate safeguard and opportunity to be heard. Since the certification and the record of the investigation are required to be included in the transcript of the entire record filed pursuant to section 10(e) or (f), the Board's actions and determinations of fact and law in regard thereto will be subject to the same court review as is provided for its other determinations under sections 10(b) and 10(c).

H.R.Rep.No.972, 74th Cong., 1st Sess. 20–21 (1935), *quoted in* Goldberg, *supra*, at 462.

3. IDC, in defending the trial court's February 20 order, intimates that the court did not actually exercise jurisdiction *per se*, but simply exercised a jurisdiction to determine its jurisdiction, an authority traditionally available to all federal courts. *See United States v. United Mine Workers of America*, 330 U.S. 258, 293, 67 S.Ct. 677, 91 L.Ed. 884 (1947). We do not agree. Unlike the court order disobeyed in *United Mine Workers*, the February 20 order issued by the trial court in this case did more

not contest the authority of the Board to issue the challenged subpoena or to call for an election. Rather, it asserts simply that those Board decisions were effected in a procedurally inadequate fashion. That issue may in time be brought to the attention of a reviewing court following a final order by the Board. It does not amount to a charge of jurisdictional abuse under the *Kyne* exception to the statutory mandate of §§ 9 and 10, an exception which the Supreme Court has justifiably characterized as "narrow." *Boire v. Greyhound Corp., supra,* at 481, 84 S.Ct. 894.

A second exception to the prohibition of pre-election review was fashioned by the Supreme Court in *McCulloch v. Sociedad Nacional,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963). There, the Court sustained the assertion of district court jurisdiction to enjoin a Board order requiring an election for seamen on ships flying a Honduran flag. The Court observed that the international concerns present in the case were so powerful that the "[i]mportant interests of the immediate parties" must be subordinated to a "uniquely compelling justification for prompt judicial resolution of the controversy over the Board's power." 372 U.S. at 17, 83 S.Ct. at 675. In so ruling the Court emphasized the narrow scope of the exception involved; indeed, it stated that its decision was "not to be taken as an enlargement of the exception in *Kyne.*" *Id.*

Plainly, the procedural irregularities cited by IDC do not satisfy the standards of *Sociedad Nacional.* Yet IDC invokes still another purported exception to the proscription of pre-election review. Contending that the Board's procedures amounted to a violation of due process of law, IDC argues that the Second Circuit's decision in *Fay v. Douds,* 172 F.2d 720 (2d Cir. 1949), supports the district court's assumption of jurisdiction. In *Fay* a union sought to enjoin an election, alleging that it had a prop-

erty interest in an ongoing collective bargaining agreement, and that the Board had held no hearing whatsoever prior to serving notice of an election. Under these circumstances the court concluded that the union's assertion of constitutional right "is not transparently frivolous," 172 F.2d at 723, and thus that jurisdiction over the suit could be entertained in the district court.

*Fay* is also of no assistance to IDC. As an employer, IDC has a statutory means of securing appellate review, a means not available to the union in *Fay.* It is not surprising, then, that the *Fay v. Douds* rule has never been approved by the Supreme Court, and has shown little growth potential, either in the Second Circuit, *see Herald Company v. Vincent,* 392 F.2d 354, 359 (2d Cir. 1968), or elsewhere, *see, e. g., Grutka v. Barbour,* 549 F.2d 5, 9 n. 7 (7th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977). No reason occurs to us for applying the rule on behalf of IDC when all the procedural irregularities of which it complains can be called to the attention of this court if IDC is dissatisfied with the election and chooses not to bargain with whichever union is certified. The IDC counterclaim presents subject matter within the exclusive jurisdiction of the court of appeals, and its counterclaim does not state a claim upon which the district court could grant relief.

■ Local 102 subscribed to the allegations of the IDC counterclaim in its capacity as an intervenor. Unlike IDC, however, if Local 102 loses the election it is afforded no statutory means for obtaining judicial review. It cannot refuse to bargain and thus provoke an unfair labor practice citation from the Board. *See* Goldberg, *supra,* at 502. Moreover, the legislative history of the NLRA makes clear that losing unions were deliberately intended not to have an appellate remedy for alleged errors in the

than simply "preserve existing conditions while it was determining its own authority to grant injunctive relief." 330 U.S. at 293, 67 S.Ct. at 695. Rather, the court authorized seemingly extensive discovery, *see Appendix,* at 485—the very sort of obstacle to Board representation proceedings that Congress sought to avoid by proscribing pre-election review. We have therefore treated the court order as an assumption of jurisdiction, rather than as simply an inquiry into the availability of jurisdiction.

Board's representation decisions. Two bills were introduced in the 76th Congress to redress the lack of any right of review for unions. These bills would have provided that any labor organization aggrieved by a Section 9 certification could obtain direct review in the court of appeals. *See* S. 1000, S. 1264, 76th Cong., 1st Sess. (1939). The bills were rejected.[4] In 1947, when the Congress was considering the Taft-Hartley amendments to the NLRA, the bill that passed the House contained an amendment to § 10(f) that would have provided all parties, including losing unions, with direct, post-election appellate review of Board certification decisions. H.R. 3020, 80th Cong., 1st Sess. (1947). The House committee report in support of this amendment expressly noted a perceived unfairness in the lack of any right to review for unions.

> *Appeals from certification.—* . . . The present act permits appeals from certifications by the Board only by employers, and then only through cumbersome proceedings that always involve risk of strike and of a finding that, by following the only course by which he could appeal, the employer committed an unfair labor practice, no matter how much in good faith he doubted the validity of the certification. This procedure is unfair to everyone; the union that wins, which frequently must wait for many months to exercise its rights; the union that loses, which has no appeal at all no matter how wrong the certification may be; the employees, who also have no appeal; and the employer, for whom an appeal involves grave risk. This bill permits any person interested to appeal from a certification, as from a final order of the Board.

H.R.Rep.No.245, 80th Cong., 1st Sess. 43 (1947), *quoted in* Goldberg, *supra*, at 464. Nevertheless, the amendment was deleted in conference on the grounds, in Senator Taft's words, that the House bill "would permit dilatory tactics in representation proceedings." 93 Cong.Rec. 6602 (daily ed. June 5, 1947), *quoted in* Goldberg, *supra*, at 465.

While Congress thus gave every indication of trying to foreclose a losing union's access to appellate review of the Board's representation decisions, the Board, relying on *United Federation of College Teach., Loc. 1460 v. Miller*, 479 F.2d 1074 (2d Cir. 1973), contends that post-election review is in fact available. In that case, the union sought pre-election district court relief, in part on the ground that there was no practical way in which it could secure post-election review. The Second Circuit disagreed. It noted that the union could picket the employer, thus violating § 8(b)(7)(B) of the NLRA, 29 U.S.C. § 158(b)(7)(B), and thereby prompt the Board to institute an unfair labor practice proceeding. In that proceeding, reasoned the Second Circuit, judicial review of irregularities in the representation proceedings would be available.

With deference, we find that reasoning unpersuasive. Unlike the employer, who has it within his own power to preserve the status quo by refusing to bargain, and to obtain judicial review if the Board proceeds against it under § 10, the losing union is left without a collective bargaining relationship, and with no certainty that its resort to picketing will produce an unfair labor practice charge. If the picketed employer finds the picketing ineffective, he may refrain from filing a charge.[5] The

---

**4.** Testifying in opposition to the proposed legislation, Charles Fahy, General Counsel of the Board, argued:

> Whereas prior to the present act employers used this review of certifications or direction of elections as a means of defeating collective bargaining, rival unions would now do so. I do not see how either organization could gain advantages in the long run, and it is obvious the public interest would suffer. . . . It is better to suffer dissatisfaction with some unit determinations, than to have each bound

up in long drawn-out litigation easily initiated by rival or minority groups. You would afford a method for the destruction of collective bargaining by this provision.

> *Hearings on S. 1000, 1264, 1392, 1550, 1580, and 2123 Before the Senate Committee on Education and Labor*, 76th Cong., 1st Sess. 462–63 (1939), *quoted in* Goldberg, *supra*, at 463–64.

**5.** *See* Goldberg, *supra*, at 504. Much the same analysis was offered by the court of appeals in *Leedom v. Kyne*, 101 U.S.App.D.C. 398, 249 F.2d 490 (1957), *aff'd*, 358 U.S. 184, 79 S.Ct.

General Counsel may decline to act even if a charge is filed. Moreover, to insist that a losing union begin recognitional picketing in violation of § 8(b)(7)(B) would seem to contravene Congress' purpose in enacting the statute—limiting such picketing and avoiding its disruptive impact. *See* Goldberg, *supra*, at 504. Worst of all, an employee adherent of the losing union may, by picketing in violation of Section 8(b)(7)(B) and thus committing an unfair labor practice, incur a risk of discharge for cause. Thus it is no answer to Local 102's complaint in intervention that there is an available statutory means for obtaining judicial review. The remedy suggested is entirely too speculative to be considered realistically available. We therefore do not rely upon *United Federation of College Teach., Loc. 1460 v. Miller, supra.*

Since post-election review under the statute would thus seem to be foreclosed to losing unions, Local 102's request for pre-election relief has some appeal. Yet the same policies favoring expeditious resolution of Board representation proceedings caution not only against pre-election suits by employers—which ought rarely, if ever, to be permitted—but also against such suits

when brought by incumbent unions. Prior to *Leedom v. Kyne*, however, the Supreme Court did not address this issue directly, holding only that post-election appellate review was unavailable. In *American Federation of Labor v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940), for example, the Court held that a local union affiliated with the American Federation of Labor could not obtain judicial review in the court of appeals under § 10(f) of a Board decision to certify a rival local affiliated with the Congress of Industrial Organization. Similarly, in *Switchmen's Union v. NMB*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), a case arising under the Railway Labor Act, the Court held that a federal district court lacked jurisdiction to review a post-election determination of appropriate bargaining unit by the National Mediation Board, despite the fact that the Railway Labor Act made no provision for judicial review of NMB decisions. Significantly, however, the Court expressly held open the possibility that incumbent unions, though precluded from post-election appellate relief, might nevertheless be able to maintain an independent suit in a district court.[6] Thus, the

180, 3 L.Ed.2d 210 (1958). There, the Board argued that the plaintiff labor organization could, as a victorious party in the election, refuse to bargain with the employer and thus provoke ordinary, post-election judicial review under § 10. The court of appeals rejected this contention because it viewed as "too remote and conjectural" the plaintiff's opportunity for review.

> Since the employer is not aggrieved by the Board's inclusion of the nine non-professionals, he cannot be relied upon to refuse to bargain and thus make it possible for the Association to bring a reviewable § 10 proceeding. Nor is it likely that an Engineers Association refusal to bargain for the nine non-professionals would induce the employer to seek review since he would then be free to deal with all employees individually. Nor could we expect such refusal to induce any of the nine non-professionals to seek review. They are hardly likely to insist upon placing their fate in the hands of a reluctant bargaining representative.

101 U.S.App.D.C. at 400, 249 F.2d at 492. In affirming, the Supreme Court also stressed the absence of an *effective* means of review for the plaintiff, noting that there was "no other means, *within their control* . . ., to protect

and enforce" the employees' rights under § 9(b)(1). 358 U.S. at 190, 79 S.Ct. at 185 (emphasis supplied). In the instant case, Local 102, as a possible losing union, would have even less control of the means of review than did the plaintiff in *Kyne.*

6. IDC contends that the Supreme Court in fact answered this question affirmatively in *Inland Empire District Council v. Millis*, 325 U.S. 697, 65 S.Ct. 1316, 89 L.Ed. 1877 (1945). In *Inland Empire*, a union that had lost a representation election brought suit in district court challenging the Board's proceedings on the ground that there had not been the "appropriate hearing" mandated by Section 9(c) of the NLRA. It argued that the failure to provide such a hearing violated the union's statutory and due process rights. The Court reviewed and rejected the union's claims on the merits; because the union had made no "showing that the Board ha[d] acted unlawfully," 325 U.S. at 700, 65 S.Ct. at 1318, the Court did not feel obliged to reach the question of the power of the district court to entertain the union's suit. *Id.* Arguably, *Inland Empire* implicitly decided what the Court claimed to be sidestepping—specifically, the question of the district court's jurisdiction

Supreme Court in *American Federation of Labor v. NLRB, supra,* stated, in connection with the possibility of district court jurisdiction in an independent suit, that:

> Its answer involves a determination whether the Wagner Act, in so far as it has given legally enforceable rights, has deprived the district courts of some portion of their original jurisdiction conferred by . . . [§ 1337] of the Judicial Code. It can be appropriately answered only upon a showing in such a suit that unlawful action of the Board has inflicted an injury on the petitioners for which the law, apart from the review provisions of the Wagner Act, affords a remedy. This question can be properly and adequately considered only when it is brought to us for review upon a suitable record.

308 U.S. at 412, 60 S.Ct. at 305–6.

The question left open by the Court in *American Federation of Labor v. NLRB, supra,* was next addressed in *Leedom v. Kyne, supra.* As noted above,[7] that case, together with *McCulloch v. Sociedad Nacional, supra,* permit a district court to entertain a pre-election suit only when the moving party's petition for review is addressed to the power and jurisdiction of the Board, as opposed merely to the Board's exercise of that power.

Turning to the Local 102 papers upon which the district court acted on February 20, 1979, we find no proposed complaint in intervention, but three affidavits. The affidavits, by Allen B. Breslow, David Crystal II, and David R. Taxin, charge that the United States Department of Justice rendered unlawful assistance to Local 20408 during the pre-election period. Such an unlawful assistance allegation is one which the Board would ordinarily consider in the certification proceeding. The Crystal and Taxin affidavits were presented to the Board in an effort to obtain a stay of the election, and Local 102 suggests that the

refusal to grant a stay was a rejection of that claim of pre-election impropriety. If the ballots favor Local 20408 and the Board should certify that Local, there is no practical route under the NLRA whereby Local 102 can present to the court of appeals its charge of unlawful government assistance. Nevertheless, since the affidavits do not claim that the representation petition is one over which the Board lacked subject matter jurisdiction, and the Board can consider the charges of unlawful assistance, we do not think that the papers before the district court at the time it issued the preliminary injunction stated a claim upon which relief could be granted. Local 102 also relies on the procedural irregularities alleged in the IDC counterclaim. But, as we have noted, these allegations do not fall within the *Leedom-McCulloch* exception to *American Federation of Labor v. NLRB.*

The Local 102 counterclaim in intervention was not filed until March 13, 1979. Thus it was not before the district court when that court entered the February 20, 1979 order which is the subject matter of this appeal. In the counterclaim in intervention, Local 102 alleges that at the time the Regional Director acted on Local 20408's petition, the Board "knew, or with the exercise of reasonable diligence, should have known, that Local 20408 was not a labor organization within the meaning of § 2(5) of the [NLRA] . . . in that . . . Local 20408 was a creation of the United States Government for the purpose of engaging in a prosecution and investigation of various activities relating to IDC and others." *Appendix,* at 159–60. Read most favorably to Local 102, the counterclaim charges that the Board deliberately undertook consideration of a representation petition by an organization which it knew was not a genuine union but rather an instrumentality of the Department of Justice created for the purpose of carrying on a

---

over the suit. But we do not read the case that broadly. In any event, subsequent cases have qualified whatever pre-election right of review was ostensibly provided in *Inland Empire. See* p. 110, *infra.*

7. See pp. 106–107, *supra.*

criminal investigation. Both Local 102 and IDC claim that such allegations state a claim within the subject matter jurisdiction of the district court, and upon which it could grant injunctive relief. We do not decide that question, for the March 13, 1979 unverified counterclaim cannot be relied upon to sustain an order granting preliminary injunctive relief on February 20, 1979. No exploration of the allegation that Local 20408 is an alter ego of the Department of Justice has taken place in the district court. Moreover, even assuming Local 102 would be likely at final hearing to establish the truth of this particular allegation, the genuineness of Local 20408's labor organization status is nevertheless a matter within the primary jurisdiction of the Board and the exclusive jurisdiction, for purposes of judicial review, of the court of appeals. While the allegations that a purported labor organization is a mere creature of the Department of Justice, and that the Board knew this and nevertheless entertained its petition, might well fit within the *Leedom-McCulloch* exception to *American Federation of Labor v. NLRB*, we should not, on the basis of a counterclaim never considered by the district court, express our views on that serious question.[8]

Thus we conclude that when the district court acted on February 20, 1979, there was before it neither an IDC counterclaim nor a Local 102 counterclaim which stated a claim upon which relief could be granted by that court.

### B) The Defense to the Subpoena Enforcement Application.

IDC offered an affirmative defense to the Board's subpoena, which it now alleges constituted a justifiable basis for the trial court's February 20 order. It urges that the Board issued the subpoena, not for the purpose of conducting the election on February 21, but rather for the impermissible purpose of assisting the criminal prosecution of IDC and others. On the basis of the allegations actually before the trial court on February 20, however, the court order impounding the election ballots and initiating discovery cannot be sustained.

As with other administrative agencies, Congress has given the Board subpoena power, but, in § 11(2) of the NLRA, has relegated it to resort to the district courts for enforcement. 29 U.S.C. § 161(2) (1976). When it seeks such enforcement the Board, like other agencies, acts as an adverse party in a civil action. *Interstate Commerce Commission v. Brimson*, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894). In order to obtain enforcement, agencies must show that the subpoena is for subject matter relevant to an inquiry within their statutory mandate. *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943). Courts must insist that the agency "not act arbitrarily or in excess of [its] statutory authority . . . ." *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 216, 66 S.Ct. 494, 509, 90 L.Ed. 614 (1946). A court will ordinarily accept as sufficient the agency's pleading that it has reason to believe the matter under investigation is within the coverage of the statute it administers. A prior showing of probable cause as to agency jurisdiction is not required, and the agency need not have actually commenced the proceedings for which the material is sought. *NLRB v. Kingston*

---

8. Judge Adams, in his opinion concurring in part and dissenting in part, elects to reach this issue, and concludes that the Local 102 counterclaim does not state a cause of action under the *Leedom-McCulloch* doctrine. Apart from our general reluctance to decide issues not plainly before us, we eschew for yet a second reason Judge Adams' approach. To hold, as Judge Adams apparently would that Local 102 has utterly no means of securing judicial review of the NLRB hearing and order would implicate serious constitutional issues, first raised by Professor Henry Hart in his *Dialogue*, concerning the abrogation of judicial review to challenge the loss of an arguable property interest. *See* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System*, 344–46 (2d ed. 1973). Judge Adams does not discuss this issue in rejecting Local 102's counterclaim. Because we find the matter more troubling than does Judge Adams, we have not reached the merits of that counterclaim, which was, once again, not before the district court when it rendered the order from which the parties have appealed.

*Trap Rock Co.*, 222 F.2d 299, 301–02 (3d Cir. 1955). The court may even, in appropriate cases, enforce the subpoena without providing a full hearing. *CAB v. Hermann*, 353 U.S. 322, 77 S.Ct. 804, 1 L.Ed.2d 852 (1957). But where the defendant in the enforcement proceeding has articulated sufficient allegations to put in issue the legitimacy of the agency's purpose in issuing the subpoena, not only may a hearing be appropriate, but discovery in aid of the development of facts at the hearing may be required. *See United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978); *United States v. Genser*, 595 F.2d 146 (3d Cir. 1979); *United States v. McCarthy*, 514 F.2d 368 (3d Cir. 1975).

 Of course, the burden on the party to whom the subpoena is addressed is not a meager one. *See LaSalle National Bank, supra*, 437 U.S. at 315, 98 S.Ct. at 2367, 57 L.Ed.2d at 235. It must come forward with facts suggesting that the subpoena is intended solely to serve purposes outside the purview of the jurisdiction of the issuing agency. *See id.; Donaldson v. United States*, 400 U.S. 517, 533, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971); *United States v. Genser*, 595 F.2d at 149–150. Moreover, the mere fact that a criminal investigation is underway simultaneous to the agency's subpoena motion does not, without more, demonstrate that the subpoena was intended to serve that impermissible purpose. *See United States v. McCarthy, supra*, at 374. The moving party must put in issue the good faith of the agency seeking enforcement, not simply the particular agent who managed the proceedings. *LaSalle National Bank, supra*, 437 U.S. at 314–319, 98 S.Ct. at 2366–2369, 57 L.Ed.2d at 234–37. If the party seeking to quash the subpoena does not satisfy these threshold requirements, a district court should, in a § 11(2) enforcement case, act summarily. Otherwise the enforcement proceeding may become a means for thwarting the expeditious discharge of the agency's responsibilities.

 We turn, then, to IDC's allegations in opposition to enforcement. To a great extent those allegations concerned procedural irregularities by the Regional Director in the proceedings leading to the order to hold the February 21, 1979 election. As we have held above, these alleged irregularities are matters which can only be raised in a defense to an unfair labor practice charge in the event IDC refuses to bargain with the winner of the election. IDC also attempted to put in issue Local 20408's claim to status as a labor organization; toward that end, it sought discovery of Local 20408's records and demanded to examine the Local's leadership. As with the procedural irregularities, Local 20408's labor organization status is a matter for the Board in the first instance, and for the court of appeals, ultimately. It would be completely inconsistent with the scheme of §§ 9 and 10 of the Act to permit conversion of a § 11(2) enforcement proceeding into a method of permitting district court litigation over the very issues which are within the Board's jurisdiction. Thus most of the allegations in opposition to enforcement of the subpoena are legally insufficient, and provide no basis for denying summary enforcement.

 One IDC charge, however, requires special mention. In his affidavit in support of a preliminary injunction against holding the election (though not in the IDC counterclaim), the attorney for IDC alleged:

Among IDC's defenses are the claims that [Local 20408's] petition was not filed on behalf of IDC's employees, but was the brainchild of the prosecution in the criminal case [pending in the Eastern District of New York]; that, in filing the petition, Eason [the president of Local 20408] acted as an agent of the United States Department of Justice, not as an agent of IDC's employees, or anyone's employees; and that the entire representation proceeding results from the interests of the Justice Department, not the NLRB.

*Appendix*, at 24. Attached to the affidavit are copies of letters which suggest that some of the delays which took place in the Board's representation proceedings were the result of requests from the Department

of Justice and were related to Mr. Eason's assistance in an investigation which resulted in the indictment referred to above.

If the affidavit made a non-frivolous showing that the Board's subpoena power was deliberately being resorted to not for the purpose of facilitating the certification of a collective bargaining representative, but rather for the purpose of gathering information for a Justice Department criminal investigation, we would have no difficulty affirming a district court decision deferring enforcement until completion of discovery of and hearing on that abuse of the subpoena power. That, however, is not the charge. While the Board may perhaps have cooperated with the Department of Justice in scheduling its hearings, there is no showing on this record that the challenged subpoena was issued in bad faith. Indeed, it is not suggested that the Excelsior List would be at all useful to the Department of Justice, to the investigating grand jury, or in the prosecution of the indictment. Thus, while the lack of bona fides of Local 20408 may be a reason why IDC can refuse to bargain should that local be certified by the Board, it is no reason for denying enforcement of a subpoena for a list of employees eligible to vote in a Board ordered election. The Board may, in other ways, have facilitated the Justice Department investigation of IDC. No showing has been made, however, that it has acted in bad faith and abused its subpoena power to serve the ends of a criminal prosecution.

Thus we conclude that nothing which was before the district court on February 20, 1979, when it granted the order impounding the election ballots and authorizing discovery, justified its doing so on the theory that IDC may have had a valid defense to enforcement of the very limited subpoena involved in this case.

## VI. CONCLUSION

Since the IDC counterclaim does not state a claim upon which relief can be granted by the district court, even as supplemented by Local 102's participation, and the grounds asserted by IDC in its defense to the Board's application to enforce a subpoena for an Excelsior List are legally insufficient, there was no basis upon which the court could properly have granted a preliminary injunction against counting the ballots at the February 21, 1979 election. That provision of the order will be reversed. No cross-appeal has been filed from that part of the order directing IDC to furnish an Excelsior List. Thus that provision remains undisturbed. What we have held suggests that the court erred in denying the Board's motion to dismiss the IDC counterclaim for failure to state a claim upon which relief may be granted, and that the discovery order was improper. However, the case is before us on an interlocutory appeal under § 1292(a)(1), and the pleadings have been altered significantly since. It may be that on the present state of the pleadings, including, in particular, the Local 102 counterclaim in intervention, discovery is appropriate. Thus we vacate the stay of the district court order entered in this court on March 21, 1979, as supplemented by the order of Chief Judge Seitz, dated April 24, 1979, staying the Board from counting the ballots until the conclusion of oral argument. The discovery order, predicated on the state of the pleadings as of February 20, 1979 shall remain stayed, but that stay shall not be construed to prevent the district court's reconsideration of the question of discovery in light of the present state of the pleadings.

ADAMS, Circuit Judge, concurring in part and dissenting in part.

My difference with the majority is a narrow but significant one. I agree that this Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1292(a)(1) because the district court's order of February 20, 1979, essentially granted preliminary injunctive relief. In addition, I agree that those portions of the district court order that are not injunctive in nature should be reviewed here only if the district court was without jurisdiction to entertain the suit. But whereas the majority would permit the district court to continue to exercise jurisdic-

tion over this case and notably to order further discovery—I am of the view that whatever limited jurisdiction the district court may have had to grant or deny the Board's application for enforcement of its administrative subpoena, it is without jurisdiction to do anything further. Consequently, I would reverse the order in its entirety, save that portion enforcing the subpoena.[1]

Two possible bases for expansive district court jurisdiction—aside from jurisdiction to issue a subpoena—have been suggested.[2] First, Interstate Dress and Local 102 urge that when the N.L.R.B. seeks judicial enforcement of a subpoena, the party against whom that subpoena is directed may challenge its enforcement on the ground that it is designed not to further legitimate administrative objectives but, rather is aimed at assisting a criminal prosecution. Lest the government use administrative proceedings as a cloak to gather information for a criminal prosecution, a body of law has recently developed, predominantly in the context of Internal Revenue Service summonses, to safeguard the rights of those whom the government has already begun to treat as future criminal defendants. *See United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978); *United States v. Genser*, 595 F.2d 146 (3d Cir. 1979); *United States v. McCarthy*, 514 F.2d 368 (3d Cir. 1975). Inasmuch as Interstate Dress is a named defendant in a criminal prosecution pending in the Eastern District of New York,[3] it has argued that the Board subpoena here, which sought only an *Excelsior* list of Interstate Dress employees for the purpose of conducting an election, was in fact designed to further a criminal prosecution. Accordingly, the argument

concludes, it was within the power of the district court to order discovery and to conduct a hearing in order to evaluate the validity of this claim.

*LaSalle National Bank* and the other cases adverted to by Interstate Dress do not, in my view, justify the district court in asserting jurisdiction here. The problems that would be generated by such a jurisdictional claim are numerous. First, it is at least uncertain whether *LaSalle National Bank* and the other Internal Revenue Service cases would be applied in the labor field in such a way as to bring under judicial scrutiny the conduct of elections by the Board. Second, as the majority notes, it is not suggested that the *Excelsior* list would be at all useful to the Department of Justice, to the investigating grand jury, or to the prosecution of the indictment.[4] Third, even if a prosecutorial use for the *Excelsior* list can be imagined, the Board offered to stipulate to a protective order precluding it from giving the list to the United States Attorney in charge of the criminal case.[5] In short, this basis for jurisdiction was very doubtful even before the district court issued its order of February 20, 1979.

But even were we to assume, *arguendo*, that the district court's jurisdiction to order discovery *might* have been premised on *LaSalle National Bank* and *Genser*, once the district court ordered the list turned over to the Board, any plausible jurisdictional claim was thereupon lost. *LaSalle National Bank* and *Genser* may be read to give the district court authority to refuse to enforce a subpoena on the ground that it is intended to further a criminal prosecution; they do not

1. Like the majority, I do not doubt that the district court has, in fact, exercised jurisdiction, as distinguished from merely considering the case in order to determine whether jurisdiction exists. *See* majority opinion at n.3.

2. Neither party questions the jurisdiction of the district court to enforce the subpoena, nor does either party suggest that such jurisdiction in and of itself authorizes the assertion of general jurisdiction by the district court over the Board's pre-election rulings.

3. *United States v. Di Lapi* (78 Cr. 496, E.D. N.Y.). Interstate Dress and other defendants are being prosecuted under 18 U.S.C. §§ 1505 and 371, the indictment charging that Interstate Dress and the other defendants have attempted to interfere with the present Board representation case by bribes and threats intended to induce Local 20408 to withdraw its representation petition.

4. Majority opinion at 113.

5. A. 261.

give it authority to enforce the subpoena but still retain jurisdiction and grant discovery to the party that has already turned over the information requested. Once the district court ordered Interstate Dress to turn over the *Excelsior* list sought by the Board it had, in effect, enforced the subpoena, and its jurisdiction to consider the propriety of the enforcement, or any other matter, was at an end.

A second possibility has been advanced to justify the district court's claim of jurisdiction. Although, as the majority opinion demonstrates,[6] Congress advertently cut off judicial review of Board decisions and actions prior to an election, two limited exceptions to this mandate have been fashioned by the Supreme Court. Interstate Dress and Local 102 now argue that their claims of Board bias and co-operation with the Justice Department qualify for inclusion within these narrow exceptions. Specifically, they maintain that the Board has allowed the scheduling and conduct of its election-related hearings to be controlled by the federal prosecutor and has acted in a biased manner throughout those hearings.

The two Supreme Court decisions allowing pre-election judicial review are *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) and *McCulloch v. Sociedad Nacional*, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963). Neither case, to my mind, may be read to support the district court's assertion of jurisdiction in the present controversy. *McCulloch* involved an extraordinary order for an election on a ship flying a foreign flag, and raised questions that implicated international relations. It has no relevance to the present case. *Kyne* concerned a union's challenge to the Board's direction of an election in a unit composed of both professional and non-professional employees when the Board had not afforded the professional employees an opportunity to vote on their inclusion in such a unit, an opportunity guaranteed them by § 9(b)(1) of the National Labor Relations Act. As the Supreme Court noted, the suit in *Kyne* was

"not one to 'review', in the sense that term was used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to specific prohibition in the Act. Section 9(b)(1) is clear and mandatory. . . . Surely, in these circumstances, a Federal District Court has jurisdiction of an original suit to prevent deprivation of a right so given." [7]

The *Kyne* exception is thus a narrow one—to be relied upon only when the Board has ignored a "clear and mandatory" provision of the Act.

But the ostensibly "clear and mandatory" provision relied upon here is § 9(c)(1) of the Act, which requires that the Board "if it has reasonable cause to believe that a question of representation affecting commerce exists, shall provide an appropriate hearing upon due notice." What is challenged then is the "appropriateness" of the Board's hearing and procedures. If *Kyne* is read so as to allow challenges to Board proceedings, on the ground that such proceedings are "inappropriate," the exception would swallow the rule. Indeed under such a rule it would be difficult to envision the case in which jurisdiction would *not* be found to exist when such a challenge is made. Even if the vast majority of such challenges were disposed of promptly and in the Board's favor, the Congressional policy of foreclosing pre-election judicial review would be substantially undermined. There is nothing in the Supreme Court's discussions of that exception to justify construing *Kyne* so broadly.[8]

---

**6.** *See* majority opinion, 105.

**7.** 358 U.S. at 188–89, 79 S.Ct. at 184.

**8.** Contrary to the concerns voiced in the majority opinion at note 8, I do not address the question whether an incumbent union has a

property interest in representing permanently all those workers who have, at one time or another, selected it as their bargaining agent. This question was neither briefed nor argued. Moreover, I do not decide whether the scheme of review set out in the National Labor Relations Act, which has now been in place for

Inasmuch as I am persuaded that the district court went beyond its jurisdiction in issuing its order of February 20, 1979, I would reverse that order in its entirety, save that portion enforcing the administrative subpoena. The majority's decision to permit the district court to continue to entertain jurisdiction and to grant additional discovery may have the unfortunate result of further fragmenting this controversy. Indeed, depending on the outcome of the election, this Court may have the occasion to confront this very case yet again if an appeal is taken from a refusal to bargain or from any other unfair labor practice charge. Yet, at the same time proceedings may well be continuing before the district court.[9] There is no evidence that Congress contemplated such a system of multiple and overlapping proceedings when it drafted the National Labor Relations Act, nor that such an arrangement would be in the best interests of our system of collective bargaining. The legislative history is clearly to the contrary. Accordingly, insofar as the Court's opinion today allows this case to continue before the district court, I respectfully dissent.

almost half a century, is unconstitutional. Indeed, all I do decide is that—except insofar as it enforces the subpoena—the district court's order under review here should be reversed. To the extent the majority opinion encourages the district court to continue its intervention in the administrative process, I believe it to be mistaken.

9. Since the filing of these opinions, but before the issuance of the mandate, Local 102 and Interstate Dress have moved this Court to stay the issuance of its mandate—and further delay

the counting of the ballots—until such time as the district court has considered what additional action it should take in light of this Court's opinion. The motion states that the district court has requested briefs from the parties and has scheduled a hearing for September 10, 1979. In so doing the district court has continued to assert jurisdiction over this case for another six weeks, and, as suggested in this opinion, may continue to adjudicate elements of this controversy even after that period has elapsed.